**ALLOY SURFACES COMPANY, Employer-Appellee, Cross-Appellant Below,**

and

**The Aetna Casualty & Surety Company, Insurer, Cross-Appellant Below, Appellants and Cross-Appellees,**

v.

**Paul CICAMORE, Claimant, Appellant Below, Appellee and Cross-Appellant,**

and

**American Employers Insurance Co., General Accident Fire & Life Assurance Corp., Lumbermens Mutual Insurance Co., Insurers-Appellees Below, Appellees.**

Supreme Court of Delaware.

June 17, 1966.

Max S. Bell, Jr., of Richards, Layton & Finger, Wilmington, for appellants and cross-appellees.

Samuel R. Russell, of Bayard, Brill, Russell & Handelman, Wilmington, for appellee and cross-appellant.

F. Alton Tybout, Wilmington, for American Employers Ins. Co.

William F. Taylor, of Young, Conaway, Stargatt & Taylor, Wilmington, for General Accident Fire & Life Assur. Corp.

Richard I. G. Jones, of Prickett & Prickett, Wilmington, for Lumbermens Mut. Ins. Co.

WOLCOTT, Chief Justice, CAREY, Justice, and MARVEL, Vice-Chancellor, sitting.

CAREY, Justice.

These are appeals from the Superior Court which remanded a Workmen's Compensation case to the Industrial Accident Board for further proceedings. The questions raised are these: Is an employee who loses all his teeth entitled to the full benefits of T. 19 Del.C. § 2326(g) or only such part thereof as the Board allows? Did the Superior Court properly award a fee to claimant's counsel for services on the appeal? In a case of occupational disease resulting from exposure over a lengthy period, may there be an apportionment of the loss by the Board among several insurers?

The findings of the Industrial Accident Board as modified by the Superior Court show these facts:

Claimant was employed by Alloy Surfaces Co. (Alloy) from some time in 1957 until August 12, 1963. He was hospitalized on August 13, 1963, suffering from painful, swollen gums and abscessed teeth. His condition was diagnosed as gingivitis, stomatitis and dental abscesses due to the long continued introduction of chrome compounds into the oral cavity. The medical experts agreed that his condition developed over a period of months or years, perhaps over the total period of his employment by Alloy. It was necessary to remove all of his teeth then remaining, twenty-two in number. At the time of the Board's hearing on April 29th, 1964, he had not been fitted with new dentures, and was unable to masticate. The Aetna Casualty & Surety Co. (Aetna) was the compensation insurer at the time of his disability and by agreement paid him compensation on the basis of temporary total disability from August

13, 1963 through September 30, 1963. He later applied for additional compensation. The Board concluded that he had suffered a recurrence of his disability on October 1st, 1963, that he had sustained no serious and permanent disfigurement as the result of losing his teeth, and that he had not established a causal relationship between his occupational disease and his subsequent loss of earning capacity. The Board directed Aetna alone to pay further compensation for the period through November 6, 1963; to pay his medical and hospital bills "including repairing damage to or replacing false dentures"; to pay his medical witness fees, and to pay his reasonable attorney's fee in the amount of thirty percent of the award or $500, whichever is smaller. The Board considered that § 2326(g) of the Workmen's Compensation Act, hereafter quoted, did not apply to this case, and it made no award thereunder.

The claimant appealed to the Superior Court on the ground that the Board had erred in refusing to allow him full compensation of $50 per week for three hundred weeks under § 2326(g). Aetna appealed from a finding of polymer fume fever, a finding that "as the result of exposure on August 13, 1963, Cicamore lost all his teeth", and the award of an attorney's fee. It also appealed from the Board's refusal to apportion the award.

The Court below held that the Board had erred in making no allowance under § 2326(g), but that claimant was not necessarily entitled to the full amount permitted thereunder. The Court accordingly ordered a remand in order for the Board to hear further evidence and to determine the amount to be awarded under that sub-paragraph. Aetna did not press its objection to the attorney's fee. Without any argument on the point the Court corrected the erroneous findings concerning polymer fume fever and exposure on August 13, 1963. The Court also affirmed the Board's refusal to apportion the total loss among the various insurers.

I (a)

The important question raised by claimant's appeal is whether he is entitled to the maximum amount allowed by § 2326(g) or something less than that maximum. This question is answered, we believe, by the very language of that sub-section itself which reads as follows:

"The Board shall award proper and equitable compensation for the loss of any member or part of the body or loss of use of any member or part of the body up to 300 weeks which shall be paid at the rate of 66⅔ per centum of his weekly wages, but no compensation shall be awarded when such loss was caused by the loss of or the loss of use of a member of the body for which compensation payments are already provided by the terms of this section."

Sub-section (h) limits the amount due to $50 per week and sub-section (i) provides that the award shall be in addition to the other compensation under § 2324 and § 2325 of the Act.

It is evident from the words of the statute that the amount to be awarded is discretionary with the Board. It does not say that a claimant shall receive 300 weeks of compensation for the loss of a part of the body; it says he shall receive "proper and equitable compensation" therefor up to three hundred weeks. The rate is to be 66⅔ percent of the weekly wages, for that clause is in mandatory terms; the Board's discretion lies in determining what number of weeks is proper and equitable.

Various preceding sub-divisions of § 2326 contain a lengthy schedule of specific fixed benefits for the loss of certain body members which are non-discretionary, except in a few instances such as partial loss of vision, when the Board must determine the extent of the loss and award the proper fractional part of a total loss. Sub-section (g) was obviously inserted to make provision for losses of body parts which could not well be included within the specific

schedule. As to these unspecified losses, the Board must determine what is equitable.

■ Even if the language of the subsection be considered ambiguous, our view of the legislative intent is supported by a comparison of the benefits which a contrary view would require under sub-section (g) as against many of the specific benefits for other losses in other parts of § 2326. For example, it is hard to believe that the Legislature intended to make an automatic award of 300 weeks for loss of all teeth, even though largely corrected by false dentures, as against 175 weeks for complete loss of hearing or 250 weeks for loss of an arm or leg, for example. It is far more reasonable to believe that any award under (g) is intended to bear some proper relationship to the specific awards provided in other parts of the section. We doubt that the Louisiana case of Fruge v. Hub City Iron Works, La.App., 131 So.2d 593, and Macaluso v. Schill-Wolfson, Inc., La.App., 56 So.2d 429, are in conflict with the foregoing view because of differences in the language of the statutes; if there be a conflict, however, we decline to follow the Louisiana rule.

■ In urging his contention that he is entitled to the maximum amount under (g), the claimant argues that the Board may not consider the extent to which false dentures have reduced his inability to masticate. In support of this proposition, he cites Alessandro Petrillo Co. v. Marioni, 3 W.W.Harr. 99, 131 A. 164, wherein the Superior Court held that a partial loss of vision in one eye required compensation for the percentage of the loss even though the use of glasses would reduce the percentage considerably. We do not consider that decision controlling in this case because it was predicated upon the mandatory language for scheduled losses in what is now sub-paragraph (a) of § 2326, in contrast to the discretionary language of (g).

■ We are satisfied that the Board committed an error of law in finding that

(g) has no application to this case. Claimant is entitled to an allowance thereunder, the amount to be resolved by the Board. Presumably because of his theory that the amount was automatically the maximum, claimant presented little evidence upon which the Board could base a discretionary judgment. No prognosis was given, for instance. Whether additional evidence was in fact available at that time we do not know. Aetna contends that it was not, and argues that the Board was right in allowing nothing for this part of the claim because of the lack of sufficient evidence. It suggests that the appropriate action of the Court is to affirm the Board, and to leave claimant free to seek a review under § 2347 of the Act, a method which Aetna contends is the only way by which the Board can receive evidence of what has transpired since the original hearing. This procedural question seems unimportant at the present time; if conditions have changed since the prior hearing, any technical procedural difficulty can be avoided by the filing of a petition under § 2347 which can be heard at the same time as the evidence upon the remand.

Aetna raises a problem concerning the factors which may be considered by the Board in reaching a determination of an amount which is proper and equitable. In particular, it suggests that loss of earning power is one factor which must be taken into account. The claimant contends that it is not. Perhaps this question is raised here prematurely; it seems desirable, however, that we consider it in order that the Board may have the benefit of our views, especially since no Delaware Court has heretofore clearly decided the point.

■ At first glance there appears to be a direct conflict between § 2325 and § 2326 (i). They read as follows:

§ 2325. "For injuries resulting in partial disability for work, except the particular cases mentioned in subsections (a)–(g) of section 2326 of this title, the compensation to be paid shall be $66\frac{2}{3}$

percent of the difference between the wages received by the injured employee before the injury and the earning power of the employee thereafter, but such compensation shall not be more than $50 per week. This compensation shall be paid during the period of such partial disability for work, not, however, beyond 300 weeks. * * *"

§ 2326(i). "Subject to subsection (e) of this section, the compensation provided for in subsections (a)–(h) of this section shall be paid in addition to the compensation provided for in sections 2324 and 2325 of this title".

In a footnote to General Motors Corp. v. Vaccarini, 9 Terry 80, 97 A.2d 550, this Court noted that the exception clause in § 2325 (then numbered differently) apparently meant that no duplication of benefits was intended. The statement was merely a comment, however, and had no bearing upon the actual decision. Upon further reflection, we are of the opinion that the two provisions are in fact reconcilable.[1]

■ § 2325 defines the compensation payable for partial disability based upon the difference in actual wages before the injury and the earning capacity thereafter. As we understand the exception therein, it means that compensation is not to be determined by § 2325 but by § 2326 if the injury is one of those described in § 2326.[2] For instance, to ascertain the benefits payable to a man who loses an arm, we look primarily to § 2326 rather than § 2325; we see that under § 2326(a) he gets two-thirds of his wages for 250 weeks; moreover, we see that under § 2326(i) he also gets any benefits allowed him by § 2324 for total disability or § 2325 for partial disability. Of course, if he is able to return to work without loss of earning capacity, any benefits under the total or partial disability sections would thereupon cease.

■ It follows, we think, that earning capacity is not a matter for consideration under § 2326. Its significance applies only to the two preceding sections which are specifically designed to encompass that loss. This conclusion is in accordance with the reasoning of General Motors Corp. v. Vaccarini, supra, in which benefits under § 2326(f) for disfigurement were held to be in addition to those under the two prior sections, even though at that time the Act did not expressly say so.

### I (b)

■ Aetna complains of the attorney's fee awarded by the Superior Court for services on the appeal. The statute here pertinent is § 2350(f) which provides:

"(f) The Superior Court may in its discretion allow a reasonable fee to claimant's attorney for his services on an appeal from the Board to the Superior Court and from the Superior Court to the Supreme Court where the claimant has prevailed in his hearing before the Board and is affirmed on appeal. * * *"

It will be noted that no fee may be allowed unless claimant prevails before the Board and is successful on appeal. The present case was appealed by the *claimant* from a ruling of the Board unfavorable to him. No fee could be allowed, therefore, on that part of the case. But Aetna also appealed from the Board's decision. As against the claimant, Aetna's appeal attacked (1) the finding concerning polymer fume fever, (2) the finding that claimant's loss of teeth was the result of exposure

1. The General Assembly apparently considers them harmonious; both were included in the Code revision of 1953; on at least two occasions since then it has made changes in both sections in a single act which included the seemingly incon-sistent language. 52 L. of D.Ch. 45; 50 L. of D.Ch. 339.

2. The sentence would perhaps be clearer if the words "other than" were to be substituted for "except".

on August 13, 1963, and (3) the award of an attorney's fee by the Board. As to (1), the record is plain that polymer fume fever had no bearing whatever on claimant's condition at any time here pertinent; that finding was not briefed in the Superior Court but was simply ignored by the parties and impliedly corrected by the Court without comment. As to (2), which likewise was not mentioned in the briefs below, the Court correctly reversed the Board since claimant's condition resulted from exposure not on any one day but for a period of months or years. As to (3), the question also was not mentioned in the briefs below or in the Court's opinion or order; obviously; it was simply abandoned by Aetna. It is apparent that no counsel fees could be awarded for services in the Superior Court on the basis of points (1) and (2) because those findings were reversed. We can find no justification for such an allowance on the basis of point (3) because no services were performed by counsel in connection with it, as far as the record shows. We think this part of the award must be reversed.

## II

The appeal of Aetna against the various other insurance companies raises a problem not before resolved in Delaware. During the years the claimant was working for Alloy, all these insurance companies had in succession provided coverage for Alloy's compensation liability. Moreover, during all or some portion of those years, the claimant had been exposed to the fumes which caused his hospitalization on August 13, 1963. Aetna became the compensation insurer for Alloy only about 2½ weeks before that hospitalization. Aetna brought these appellees into the case before the Board, demanding that each be required to pay a proportionate part of the final award. The Board ordered Aetna alone to pay it, and this ruling was affirmed by the Superior Court. It is again questioned here.

Aetna's argument is predicated upon these two sections of the Act:

§ 2304. "Every employer and employee, adult and minor, except as expressly excluded in this chapter, shall be bound by the provisions of this chapter respectively to pay and to accept compensation for personal injury or death by accident arising out of and in the course of employment, regardless of the question of negligence and to the exclusion of all other rights and remedies".

§ 2301 defines "personal injury" in this language:

" 'Injury' and 'Personal injury' mean violence to the physical structure of the body, such disease or infection as naturally results directly therefrom when reasonably treated, and compensable occupational diseases arising out of and in the course of the employment."

It is incorrect, says Aetna, to hold that the time of *disability* fixes liability because that liability is based upon *injury*. Other parts of the Act, Aetna argues, simply define how the amount of compensation is to be calculated, but liability for it depends upon the time when the injury is sustained. The evidence here clearly shows that the injury could not have been sustained merely in the 2½ weeks of Aetna's coverage; exposure for months or years was involved. One or more of the other carriers must be at least partially liable, Aetna concludes, for nothing in the law divests or releases liability once imposed.

Aetna concedes that its theory runs contrary to the numerical weight of authority in other states which have no statutory regulation for apportionment. See 2 Larson's Workmen's Compensation Law § 95:- 21. It suggests, however, that the acts in most states define liability for occupational diseases in terms of disability rather than injury.

A somewhat similar argument was rejected in Textileather Corp. v. Great Amer. Ind. Co., 108 N.J.L. 121, 156 A. 840, where the last insurer was held solely responsible, despite the fact that its policy became effective only two or three weeks before the employee died and only about eight days before he became unable to work. That decision has been reaffirmed by the New Jersey Supreme Court as recently as 1964 in Bond v. Rose Ribbon & Carbon Mfg. Co., 42 N.J. 308, 200 A.2d 322.

We are not satisfied that Aetna's theory is correct. Under § 2301 the word "injury" includes both violence to the physical structure of the body and compensable occupational disease. That same section defines compensable occupational disease as including "all occupational diseases arising out of and in the course of employment *only* when the exposure * * * has occurred during the employment *and the disability has commenced within five months after the termination of such exposure*". (emphasis supplied) If we replace in § 2304 the words "personal injury" by the language defining that term as applied to compensable disease, the matter becomes clearer. It would then read: "Every employer and employee * * * shall be bound * * * to pay and to accept compensation for all occupational disease * * * only when the exposure * * * has occurred during the employment and the disability has commenced within five months after the termination of the exposure". This language hardly supports the view that liability in this type of case is not grounded upon disability; indeed, it suggests the contrary.

There are other provisions of the Act which we think shed some light upon the problem. Thus under § 2342, unless the employer is notified of the claim within six months after the employee first acquired knowledge of the causal connection between his disability and his employment, no compensation is payable. Under § 2361, the limitations for claims "in case of personal injury" is two years after the accident or death, while for "compensable occupational disease" it is one year after the employee acquires knowledge of causal connection, or five years after cessation of exposure. These various provisions indicate a legislative recognition that for many purposes violence to the physical structure of the body cannot be dealt with in the same way as occupational disease. It is usually easy to prove a definite time, place and cause of injury by violence; on the other hand, while proof of place and cause of occupational disease may not be especially difficult, yet proof of time of inception is often practically impossible because the progress of such disease is gradual, being sometimes slow and sometimes swift. The present case is a good example of a situation where qualified specialists cannot trace the history of a disease with any satisfactory degree of certainty; the most they could say was that its development was a matter of months or years. It would indeed be a hardship to place that burden of proof upon the employee simply because his employer changed insurers during the period of exposure.

We think, therefore, that the distinction which Aetna tries to draw between our Act and those of certain other states is non-existent. That argument was, of course, advanced by it to avoid the application of the majority rule which puts the whole burden of compensation payments upon the last insurer in a case like this. Illustrative decisions are Textileather v. Great Amer. Ind. Co., (N.J.), supra; King v. St. Louis Steel Cast Co., 353 Mo. 400, 182 S.W.2d 560; Employers Mut. Liab. Ins. Co. v. McCormick, 195 Wis. 410, 217 N.W. 738; Glenn v. Columbia Silica Sand Co., 236 S.C. 13, 112 S.E.2d 711. Connecticut apparently permits recovery by the claimant against any insurer whose policy was effective during his exposure; whether that insurer may require contribution from other insurers we do not know. Plecity v. George McLachlin Hat Co., 116 Conn. 216, 164 A. 707. Cali-

fornia has by judicial decision adopted an apportionment practice. Colonial Ins. Co. v. Industrial Acc. Comm., 29 Cal.2d 79, 172 P.2d 884. Under its rule, the employee collects from the last insurer, which may bring an independent action in a Court for contribution. Many other states have statutes dealing with the problem of apportionment among insurers as well as among successive employers. If the majority rule placing responsibility upon the last carrier, which we are now accepting as the law of this State, be deemed unjust, the remedy lies with the General Assembly.

For the reasons given, the allowance of an attorney's fee in the Court below will be reversed; the judgment in all other respects will be affirmed.