STANDARD DISTRIBUTING COMPA-
NY, Through its Workers' Compensa-
tion Carrier, PENNSYLVANIA MANU-
FACTURER'S ASSOCIATION INSUR-
ANCE COMPANY, Employer–Appellee
Below, Appellant,

v.

Robert NALLY, Claimant–Appellee
Below, Appellee,

and

Standard Distributing Company, Through
its Workers' Compensation Carrier,
Northbrook Property & Casualty Com-
pany, Employer–Appellant Below, Ap-
pellee.

Supreme Court of Delaware.

Submitted: April 27, 1993.
Decided: Sept. 17, 1993.

J.R. Julian (argued), J.R. Julian, P.A., Wilmington, for employer-appellee below, appellant Standard Distributing Co. through Pennsylvania Manufacturer's Ass'n Ins. Co.

Sidney Balick (argued), Wilmington, for claimant-appellee below, appellee Robert Nally.

George B. Heckler, Jr. (argued), and John J. Klusman, Jr., Heckler & Cattie, Wilmington, for employer-appellant below, appellee Standard Distributing Co. through Northbrook Property & Cas. Co.

Before VEASEY, C.J., WALSH and HOLLAND, JJ.

WALSH, Justice:

In this appeal from the Superior Court, we address the vexing question of successive carrier responsibility for alleged recurrence of a previous injury resulting in a claim for workers' compensation. The Superior Court, in reversing the Industrial Accident Board, ruled that, as a matter of law, a recurring injury resulting from the performance of normal employment duties constitutes a new injury for which the compensation carrier at the time of the new injury is responsible. In our view, the appropriate methodology for determining successive carrier responsibility requires the determination of whether the new episode is the producing cause of an industrial accident resulting in changed physical condition before the second carrier may be held liable. Accordingly, we reverse.

I

The facts which underlie the successive claims are essentially undisputed. On March 1, 1988, claimant-appellant, Robert Nally ("Nally"), injured his lower back in a work-related accident that occurred while he was employed by Standard Distributing Company ("Standard") as a delivery person. At the time of the accident, Northbrook Property and Casualty Company ("Northbrook") was the workers' compensation insurance carrier for Standard.

On the day of the accident, Nally was driving a delivery truck with five bays on each side, each with its own door. Nally was injured when he attempted to open a bay door that was stuck. As the door opened, six cases of beer fell out and pushed Nally to the ground. Some of the cases landed on Nally and he immediately felt pain in his lower back, right buttock and right leg. Nally was initially treated by Dr. Brent Noyes. Thereafter, he was treated by Dr. Ross Ufberg for pain in his lower back and his right leg.

As a result of the accident, Nally, under an agreement with Northbrook, collected total disability benefits from March 2, 1988 through June 28, 1988 and partial disability benefits thereafter until May 14, 1989. In January 1989, Nally returned to work on a restricted basis as a night packer, a lesser paying job which required him to place bottles in boxes. On March 10, 1989, Dr. Ufberg released Nally to return to work without restriction, although Nally continued to experience some back pain for which he took medication.

On March 20, 1989, while making a delivery, Nally once again injured his lower back in a work-related event. The second episode occurred as Nally was unloading several full kegs of beer, weighing 160–165 pounds each, from his delivery truck. Delivering beer kegs was one of Nally's regular duties. One of the kegs to be unloaded was toward the rear of the truck and had to be pulled to the door. Nally's normal method of getting a full keg from the back of the truck to the door was not to lift the keg, but to roll the keg to the front and to

flip it out the door, allowing it to fall approximately 20 inches to the ground. As Nally prepared to flip the keg out the door, he put his foot on the truck to gain leverage. He immediately felt pain across his lower back, right buttock and right thigh. At the time of the second accident, Pennsylvania Manufacturer's Association Insurance Company ("PMA") was the workers' compensation insurance carrier for Standard.

In a petition filed with the Industrial Accident Board ("Board"), Nally alleged that the March 20, 1989 injury was a "recurrence" of the March 1, 1988 accident for which Northbrook was responsible. Subsequently, Nally added PMA as a party, alleging that the March 20, 1989 disability was a new accident for which PMA was responsible. Northbrook filed a Petition to Terminate with the Industrial Accident Board ("Board"), alleging that Nally suffered a new accident/injury on March 20, 1989 for which PMA was on the risk. The carriers did not contest Nally's entitlement to compensation for the medical expenses attributable to the second episode. The dispute is over which carrier, Northbrook or PMA, is responsible for paying Nally's benefits.

The Board conducted an evidentiary hearing at which several physicians testified. Nally's treating physician for both incidents was Dr. Ufberg. Dr. Ufberg testified that when he saw Nally shortly after the first accident, he complained of lower back pain with sharp aching across his right lumbosacral region that was worse while standing straight or while sitting for prolonged periods of time. Dr. Ufberg stated that his initial impression was that Nally suffered a lumbosacral strain and fibromyalgia. Dr. Ufberg continued to see Nally through May 1988, but Nally exhibited little improvement. Based upon Nally's symptoms as well as the type of work that he did, Dr. Ufberg considered the implications of a disc injury and ordered a CAT scan. In Dr. Ufberg's opinion, the CAT scan, dated May 9, 1988, revealed findings suspicious of herniation of the nucleus pulposus at L3–4. The doctor testified that an injury at L3–4 disc is not common in industrial accidents involving bending and lifting but is consistent with a fall backwards.

Thereafter, Dr. Ufberg ordered an MRI that, in his opinion, revealed a degeneration of the L3–4 disc as well as posterior bulging at L3–4 causing encroachment on the thecal sac. Dr. Ufberg continued to treat Nally through June and July of 1988 and his office notes reveal that Nally was still complaining of pain, sometimes severe, and reflect that Nally was having good and bad days. Dr. Ufberg noted Nally's general condition worsened with activity. At that time, Dr. Ufberg had the same three impressions as before: herniated disc; lumbosacral strain; and fibromyalgia.

Dr. Ufberg's report of September 1, 1988, recited that Nally continued to note significant lower back pain that worsened with certain activities such as lifting or carrying heavy items. He further noted occasional tingling sensations radiating to the right buttock. Dr. Ufberg ordered an EMG nerve conduction study that showed no nerve root irritation. Dr. Ufberg stated that this test was performed to determine if there was active pressure from the disc on the nerve roots. In Dr. Ufberg's opinion, however, the test results did not rule out herniation since the EMG merely tests nerve function. Dr. Ufberg continued to see Nally through March 10, 1989, when, at Nally's urging, Dr. Ufberg released him to work without restriction but to continue on prescribed medication.

As previously noted, Nally sustained his second injury one week after returning to full duty, and was seen by Dr. Ufberg on March 21 with complaints of sharp pain across his lumbosacral region radiating into his right posterior thigh. Dr. Ufberg testified that these findings were similar to, and consistent with, the prior findings. In Dr. Ufberg's opinion, Nally suffered a "flare-up" of his old injury, not a new injury, as a result of the incident with the keg. Dr. Ufberg related all of Nally's disability to his March 1, 1988 injury and viewed the 1989 event as a recurrence of the 1988 injury.

Dr. Joseph M. Barsky, Jr. performed an independent medical examination in February 1990 at the request of PMA after reviewing all the medical records of the treating physicians since the 1988 accident. Dr. Barsky testified that Nally had a herniated disc at L3–4 as a result of the first accident. This diagnosis was based on Dr. Ufberg's history and records as well as the CAT scan and MRI that were performed. Dr. Barsky ordered a second MRI that was performed on April 26, 1989, which, in his opinion, revealed no significant change from the MRI performed in May 1988. Dr. Barsky testified that the March 20, 1989 incident was a recurrence of the prior disc problem. Finally, Dr. Barsky testified that he would not have released Nally to work without restrictions in March 1989 because he had a herniated disc at the L3–4 level which would require restrictions. Dr. Barsky testified that the purpose for not releasing a patient of this type to full duty is to limit exposure to any type of recurrence.

Dr. Bikash Bose, a neurosurgeon who performed a lumbar diskectomy on Nally in 1989, testified that the lumbar myelogram and CAT scan performed on August 8, 1989 revealed a herniated disc at L3–4. Dr. Bose testified that the surgery confirmed the results of the myelogram. Dr. Bose's testified that there was no new injury as a result of the March 20, 1989 incident. He stated that the type of accident that Nally experienced on March 1, 1988 was competent to cause the disc injury described in the CAT scan and MRI.

Dr. Jerry L. Case performed a series of independent medical examinations of Nally at the request of Northbrook. Dr. Case stated that when he first saw Nally on June 14, 1988, he obtained a detailed history from him. Dr. Case testified that there was no clinical evidence of disc herniation at his June 14, 1988 examination of Nally. Dr. Case further testified that there was no evidence of a herniation when Nally returned to work in March 1989. Dr. Case testified that this was not a recurrence without an intervening event but, rather, that the second incident was the precipitating cause of the herniation.

In its award of compensation, the Board noted that it was "persuaded by the testimony of Dr. Ufberg that the claimant suffered a recurrence of symptoms related to his original injury March 1, 1988." The Board concluded that the 1989 incident did not involve sufficient untoward activity to cause a new injury and could not be deemed an intervening event. The Board was also of the view that Nally had been released for work prematurely at a time when he was not free of the effects of the 1988 injury. Accordingly, Northbrook was held responsible for payment of benefits effective March 21, 1989. The Board also granted Northbrook's Petition to Terminate partial disability benefits effective March 13, 1989, the date that Nally returned to full duty.

On appeal, the Superior Court reversed the Board's determination that Northbrook was responsible for payment of benefits attributable to the 1989 episode. The court ruled that, despite application of the correct legal standard by the Board, the record did not contain substantial evidence to support the Board's decision that Nally had sustained a recurrence and not an aggravation of his prior disc problem. The Court noted that there was competent medical evidence to show that Nally had a disc herniation at L3–4 as a result of the first accident and his condition remained unchanged after the second accident. However, the court ruled, as a matter of law, that, under *DiSabatino & Sons, Inc. v. Facciolo*, Del.Supr., 306 A.2d 716 (1973), the second accident constituted an "intervening event" that "aggravated" Nally's prior disc condition.

In a supplemental decision denying reargument, the Superior Court ruled that the standard of causation for the second event, as established in *Facciolo*, had been modified by this Court's subsequent decision in *Duvall v. Charles Connell Roofing*, Del. Supr., 564 A.2d 1132 (1989) and, therefore, any work-related event or episode that results in disability constitutes an aggravation or new injury.

## II

On appeal, PMA, joined by Nally, seeks reinstatement of the Board's determination that Northbrook, as the carrier on the risk at the time of the 1988 injury, should respond to Nally's entitlement to benefits attributable to the 1989 episode. To the contrary, Northbrook contends that the Superior Court correctly determined that the 1989 episode brought about or aggravated the 1988 injury, and is thus compensable by PMA, the carrier on the risk at the time of the new event.

The first case in which this Court squarely addressed the successive carrier problem in the case of accidental injury was *DiSabatino & Sons, Inc. v. Facciolo*, Del.Supr., 306 A.2d 716 (1973).[1] In *Facciolo*, the claimant suffered a compensable injury to his back, returned to work and, after the employer changed insurers, was again disabled with back problems after escaping from a manhole cave-in. *Id.* at 718. The Court adopted the recurrence/aggravation standard for determining which insurer is liable.

> If an injured work[er] suffers a recurrence, he [or she] may apply for further compensation under [19 *Del.C.* § 2347] and if there has in the meantime been a change of insurers, the liability therefor falls upon the insurer which was liable for the original benefits. On the other hand, if [the worker's] condition is not a true recurrence, but is brought about or aggravated by a new work-connected accident, the liability falls upon that insurer whose policy is in effect at the date of the new accident.

*Id.* at 719.

"Recurrence" was defined as "the return of an impairment without the intervention of a new or independent accident." *Id.* Thus, in the absence of an intervening accident, the first insurer must respond. If,

however, there was "a new work-connected accident or episode, whether or not due to unusual exertion" the liability would be placed upon the new insurer. *Id.* The Court further held that a finding of unusual exertion necessarily implies the existence of an aggravation. *Id.* at 270. Finally, both insurance carriers would escape liability if the second injury was an aggravation which was *not* caused by unusual exertion.

We again considered the successive carrier problem in *Mr. Pizza, Inc. v. Schwartz*, Del.Supr., 489 A.2d 427 (1985). As in *Facciolo*, the claimant in *Schwartz* also suffered successive injuries to his back with an intervening change in insurers by the employer. After finding that the claimant's injury was the result of unusual exertion, the Court applied *Facciolo* and held that the second injury was an aggravation. This Court, however, also expressed unease with the bright line rule set forth in *Facciolo*, noting that "[t]he difficulty is that back conditions are often caused in part by a prior condition or injury, and in part by a new incident and consequently a primary cause is difficult to find." *Id.* at 431–32.

In *Duvall v. Charles Connell Roofing*, Del.Supr., 564 A.2d 1132 (1989), this Court abandoned the unusual exertion rule. In its place the Court adopted the usual exertion rule, in which the claimant may recover, regardless of any preexisting weakness or disease, if it is shown that "the ordinary stress and strain of employment is a substantial cause of the injury." *Id.* at 1136. *Duvall* did not purport to overrule *Facciolo* or *Schwartz* to the extent those decisions employed the unusual exertion concept in the recurrence/aggravation context. Given the reliance placed upon the unusual exertion rule as a determinant of whether an injury is a recurrence or an aggravation, the *Facciolo* standard appears tenuous. As a result, the Superior Court has wres-

---

1. In *Alloy Surfaces Co. v. Cicamore*, Del.Supr., 221 A.2d 480 (1966), this Court adopted the "last injurious exposure" rule, which "puts the whole burden of compensation payments upon the last insurer" in the case of a compensable occupational disease which developed over a lengthy period of time. *Id.* at 486. The *Cicamore* rule was expressly applied in cases of successive accidental injury in *Forbes Steel and Wire Co. v. Graham*, Del.Supr., 518 A.2d 86 (1986), although earlier implicitly recognized in *Facciolo*. *Facciolo*, 306 A.2d at 719.

tled with its application.[2]

The difficulty in successive accidental injury cases is distinguishing between recurrence and aggravation in the legal sense. As the record in this case suggests, from a medical standpoint, opining physicians are more concerned with symptomatology than causation, and may use the term interchangeably in diagnosis. In fixing liability, however, the Board, and a reviewing court, must focus equally on the causation factor since compensability for the new condition depends on its relationship to "a new work-connected accident." *Facciolo*, 306 A.2d at 719.

The use of the word "aggravation" by this Court in *Facciolo* indicates that the injury must be worsened by the second event before the second carrier will be liable. In a literal sense "aggravation" means that a condition is "made worse, more serious, or more severe." *Webster's Ninth New Collegiate Dictionary*, 64 (1990). The employee's physical condition after the second event may appear worse, or more serious, because of the appearance, or reappearance, of symptoms which, from a medical standpoint, suggests an aggravation. In order to fix carrier responsibility, however, the analysis must proceed to the causation stage to determine if the changed condition is attributable to a new industrial accident. In short, the question is not whether the employee's pain or other symptoms have returned but whether there has been a new injury or worsening of a previous injury attributable to an untoward event.

In ruling that Nally had suffered an aggravation attributable to a new incident, the Superior Court focused primarily on Nally's increased symptomatology and not on the causative effect of the second event. The court was apparently influenced, in part, by what it viewed as the lesser standard of causation announced in *Duvall*. In our view, the court extended the *Duvall* holding to an area not intended.

■ We believe the focus of the inquiry in aggravation/recurrence disputes must be returned to the nature of the second event. *Duvall's* use of a "substantial causation" standard as the basis for rejection of the unusual exertion rule should be limited to claims where the very issue of compensability is at stake. *Cf. Reese v. Home Budget Center*, Del.Supr., 619 A.2d 907 (1992). The concept should not be applied in successive carrier disputes where there is a need to fix an untoward event as the basis for allocating responsibility between carriers. In *Duvall* the issue was whether the injured employee would receive any compensation. In successive carrier disputes where compensability is conceded, as here, the determination is one of liability between carriers. That determination, posing different policy concerns, should not turn on whether unusual exertion is present but whether a genuine intervening event has occurred which brings out a new injury. Carrier liability should be fixed on primary responsibility for risks as they arise and, as a matter of policy to avoid delay and confusion, should continue as long as the consequences of that injury are present. *Pennsylvania Manufacturer's Assn. Ins. Co. v. Home Insurance Co.*, Del.Supr., 584 A.2d 1209 (1990).

In the same vein, the statement in *Facciolo* that the second carrier is liable if the second condition "is caused by a new work-connected accident or episode, whether or not due to accident or episode, whether or not due to unusual exertion," *Facciolo*, 306 A.2d at 719, should not be read expansively to eliminate the need to establish an unto-

---

**2.** In the wake of this Court's decision in *Duvall*, the Superior Court has attempted to reconcile *Facciolo* and *Schwartz* with the usual exertion rule. In *DiMaio v. Bell's Supply Co.*, Del.Super., C.A. No. 89A–OC–7, Bifferato, J., 1990 WL 47360 (April 30, 1990) (ORDER), the court held that "[i]n reading *Duvall* in conjunction with *Facciolo,* all that is required is that [the intervening event] ... be a substantial cause of the second injury." *Id.* at 2. Similarly, in *Sea Watch International v. Lynch*, Del.Super., C.A. No. 89A–04–14, Steele, J. (July 20, 1992), the court held that "the question is whether there was substantial evidence before the Board that the ordinary stress and strain of claimant's employment ... was a 'substantial cause' of her ensuing disability and impairment—*i.e.,* was her condition 'brought about or aggravated by a new work-connected accident.' " *Id.* at 16–17.

ward event as the producing cause of the second condition. The need to establish a second accident or event, beyond the normal duties of employment, is a continuing requirement in order to shift liability from the first carrier who bears responsibility for the effect of the original injury. As Professor Larson notes:

> This group also includes the kind of case in which a worker has suffered a back strain, followed by a period of work with continuing symptoms indicating that the original condition persists, and culminating in a second period of disability precipitated by some lift or exertion.

4 *Larson on Workmen's Compensation* § 95.23 p. 17–152.

■ The rule we endorse for determining successive carrier responsibility in recurrence/aggravation disputes places responsibility on the carrier on the risk at the time of the initial injury when the claimant, with continuing symptoms and disability, sustains a further injury unaccompanied by any intervening or untoward event which could be deemed the proximate cause of the new condition. On the other hand, where an employee with a previous compensable injury has sustained a subsequent industrial accident resulting in an aggravation of his physical condition, the second carrier must respond to the claim for additional compensation. *Pennsylvania Manufacturer's Assn. Ins. Co. v. Home Insurance Co., supra.* The burden of proving the causative effect of the second event is upon the initial carrier seeking to shift responsibility for the consequences of the original injury. *See Aguiar v. Control Power Industries, Inc.,* R.I.Supr., 496 A.2d 147, 149 (1985); *Poole v. Statler Tissue Corp.,* Me.Supr., 400 A.2d 1067, 1069 (1979).

We recognize that there is an element of arbitrariness in a rule which emphasizes proof of a second producing accident, but in the complex area of successive carrier responsibility for continuing injury, in the absence of specific statutory allocation of responsibility, this Court must provide a standard of general application. *Facciolo,* 306 A.2d at 719. The resolution of successive carrier disputes rests as well on "the policy choices of the jurisdiction" as on "the medical characterization of the second episode as aggravation or recurrence." 4 *Larson on Worker's Compensation* § 95.11 p. 17–116.

■ Under the test here announced, it is clear that there is substantial evidence in the record before the Board to support the conclusion that Nally suffered a recurrence. Indeed, three of the medical experts who opined on that question stated that the 1989 episode did not worsen Nally's back injury. Although Dr. Case's opinion was to the contrary, the Board was entitled to accept the testimony of one medical expert over the views of another. *DiSabatino v. Wortman,* Del.Supr., 453 A.2d 102, 105 (1982).

There was also evidence before the Board that when Nally returned to his regular duties a week before the 1989 episode he was not symptom free from his 1988 injury and continued under medication. As the Board noted, in hindsight, Nally was probably released to full duty prematurely. Nally's description of the 1989 event supports the Board's conclusion that he was engaged in normal activity in rolling a keg and performed that chore no differently on that occasion than in the past. Undoubtedly, the pain experienced by Nally following the 1989 incident was greater than that which he felt immediately before the injury but that is not the critical factor. If the 1989 incident was not an untoward event which caused a new injury or aggravated the 1988 injury, his subsequent claims for benefits must be viewed as a recurrence, as the Board determined. As the carrier on the risk at the time of the 1988 injury, Northbrook must respond to the 1989 claim for additional compensation.

### III

In the Superior Court, Northbrook asserted, as an additional ground for appeal, that the Board abused its discretion in questioning Nally during the course of his cross-examination. This questioning of the claimant, it was argued, demonstrated the

Board's pre-determination of the case. In view of its holding that the Board's decision required reversal on substantial evidence grounds, the Superior Court declined to address this issue. Notwithstanding the Superior Court's failure to rule on the matter, we may dispose of it, in the interests of judicial economy, since the issue was "fairly presented to the trial court." Supreme Court Rule 8. *Cannelongo v. Fidelity America Small Business Investment Co.*, Del.Supr., 540 A.2d 435, 440 n. 5 (1988).

▆▆ Administrative agencies operate less formally than courts of law. For example, the rules of evidence do not strictly apply. *Pany of Delaware, Inc. v. Carroll*, Del.Super., 316 A.2d 562, 564 (1972). While it is desirable that the primary responsibility for the examination and cross-examination of witnesses be that of counsel, the Board may, in its discretion, "examine persons as witnesses ... and do all other things conformable to law which are necessary to enable it effectively to discharge the duties of office." 19 *Del.C.* § 2122(a). In the absence of an abuse of that process, a reviewing court will not fault the administrative agency. Upon review of the record, we find no basis for concluding that the Board engaged in improper questioning or that its questions suggested a pre-disposition of the matter before it. Accordingly, we find no merit in Northbrook's contention.

\*     \*     \*     \*     \*     \*

The decision of the Superior Court is REVERSED and the matter REMANDED with direction to reinstate the decision of the Board.