IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| COREY FERRELL, | § | |
| | § | No. 152, 2025 |
| Claimant Below, | § | |
| Appellant, | § | |
| | § | Court Below: Superior Court |
| v. | § | of the State of Delaware |
| | § | |
| CITY OF WILMINGTON | § | C. A. No. N24A-08-004 |
| | § | |
| Employer Below, | § | |
| Appellee. | § | |

Submitted: October 8, 2025
Decided: December 4, 2025

Before **SEITZ**, Chief Justice; **VALIHURA** and **LEGROW**, Justices.

Upon appeal from the Superior Court of the State of Delaware. **AFFIRMED**.

Gary S. Nitsche, Esquire, James Gaspero Jr., Esquire, NITSCHE & FREDRICKS, LLC, Wilmington, Delaware, *for Appellant Corey Ferrell.*

Gregory P. Skolnik, Esquire, HECKLER & FRABIZZIO, PA, Wilmington, Delaware, *for Appellee City of Wilmington.*

**LEGROW**, Justice:

In 2015, Corey Ferrell sustained a compensable work injury to his back while working in a part-time capacity for the Belvedere Fire Company ("Belvedere"). In 2018, Ferrell accepted a commutation of the 2015 claim with Belvedere's workers' compensation insurance carrier. The commutation globally resolved the claim and released the insurer from further liability with respect to the injury.

In 2023, Ferrell injured his back while working for the Wilmington Fire Department ("Wilmington FD"). Wilmington FD denied Ferrell's claim for workers' compensation, and the parties submitted the disputed claim to the Industrial Accident Board ("IAB" or the "Board").

After receiving evidence, the Board held that the 2023 incident was a recurrence of Ferrell's 2015 injury rather than an aggravation of that injury. Under settled law, a recurrence of a work injury is compensable by the original carrier that covered that injury, while an aggravation of an injury caused by a second accident or event is compensable by the carrier that insured the employer at the time of the aggravation. In most instances, the distinction between a recurrence and an aggravation simply apportions liability between carriers and does not result in a lapse of coverage for a worker. But because Ferrell commuted his first claim and released Belvedere from further liability, he could not recover unless the 2023 injury was an

1

aggravation caused by a second event. Accordingly, the Board's holding left Ferrell without a compensable claim. The Superior Court affirmed the Board's decision.[1]

On appeal, Ferrell urges us to reverse on two independent grounds. First, he contends that the Board used the wrong standard when it applied the "aggravation" versus "recurrence" analysis announced in *Standard Distributing Co. v. Nally*.[2] Ferrell further contends that the 2023 incident was an untoward and intervening event that created a separate compensable injury. Second, Ferrell argues that the Board's decision is not supported by substantial evidence. We find that the Superior Court and the Board applied the correct standard, and the Board's decision was supported by substantial evidence. We therefore affirm the Board's judgment.

## I.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND[3]

### A.    Ferrell's 2015 injury, treatment, and commutation

In 2015, Ferrell was employed by Belvedere on a part-time basis and employed full time with Appellee Wilmington FD.[4] While working for Belvedere, Ferrell was involved in a motor vehicle crash that caused an injury to his back. An

---

[1] *Ferrell v. City of Wilmington*, 2025 WL 753378 (Del. Super. Mar. 10, 2025).

[2] 630 A.2d 640, 644–46 (Del. 1993) ("The rule we endorse for determining successive carrier responsibility in recurrence/aggravation disputes places responsibility on the carrier on the risk at the time of the initial injury when the claimant, with continuing symptoms and disability, sustains a further injury unaccompanied by any intervening or untoward event which could be deemed the proximate cause of the new condition.").

[3] The facts, unless otherwise noted, are drawn from the Superior Court's Memorandum Opinion affirming the Board's decision. *Ferrell*, 2025 WL 753378.

[4] App. to Appellant's Opening Br. [hereinafter "A__"] at A39-40 (IAB Hr'g Tr.).

MRI performed after the accident identified bulges and herniations in Ferrell's spine. Ferrell filed a workers' compensation claim and underwent various treatments. In 2017, Ferrell "received a settlement for 6% permanency to [his] cervical spine and 5% permanency to [his] thoracic spine."[5]

In 2018, Ferrell accepted a global commutation of his 2015 claim against Belvedere's workers' compensation carrier. In the commutation Ferrell agreed: "[i]n exchange for releasing the workers' compensation carrier from future benefit liability described above, I'm accepting a lump sum benefit in the form of waiver of the workers' compensation carrier's lien credit, which I would otherwise be obligated to repay from the proceeds of a third party settlement."[6] Under this agreement, Ferrell settled the 2015 claim outright and released Belvedere's carrier from "*future benefit liability*."[7] Ferrell later returned to work and continued his duties as a firefighter.

After Ferrell returned to firefighting, there is no record that he was unable to work due to his 2015 spinal injury. In 2021, however, he was rear-ended in a non-work-related motor vehicle crash. Several weeks after the 2021 crash, Ferrell experienced back spasms and eventually sought care from his family physician, Dr.

---

[5] A62 at 34:19–21 (IAB Hr'g Tr.).

[6] A61 at 33:10–15 (IAB Hr'g Tr.).

[7] *Id.* at 33:11–12 (IAB Hr'g Tr.) (emphasis added).

Tucker.[8]  The pain from this 2021 crash was reportedly significant.  Dr. Tucker ordered an x-ray and treatment in 2021, but Ferrell could not recall whether he completed any of the recommended follow-up treatment.

**B.    The October 6, 2023 incident**

On October 6, 2023, while working for Wilmington FD, Ferrell responded to a call at a high-rise apartment building.  High-rise buildings may require firefighters to carry special equipment in a "high-rise pack" that can weigh 30–40 pounds.  When Ferrell's unit arrived at the high-rise building, one of his supervising officers did not pick up his designated high-rise pack.  Ferrell felt that the pack was essential equipment and decided to carry both the officer's pack and his own.

After ascending approximately three flights of stairs with the two packs, Ferrell began to experience a sudden shortness of breath accompanied by chest pain.  He was able to get himself "back together" and returned to the fire station with the other firefighters.[9]  At the station, Ferrell reported experiencing back spasms and shortness of breath.  He also testified that he felt a "pop" in his back when he was ascending the stairs, but the timeline of when Ferrell reported the "pop" is not clear.[10]

---

[8] This period was during the COVID-19 pandemic and Ferrell reportedly delayed seeing Dr. Tucker for treatment.  A64 at 36:4–16 (IAB Hr'g Tr.).

[9] A42 at 14:20 (IAB Hr'g Tr.).

[10] Appellee's Answering Br. at 17 ("Although there was one note late in the game that recorded a history of [Ferrell] feeling a pop, that history was inconsistent with records from many other providers more contemporaneous to the alleged event.").

Ferrell was transported to the hospital to evaluate his chest pain and shortness of breath. Ultimately, doctors concluded that Ferrell's cardiac health was not impaired.

Ferrell was advised to follow-up with his physician regarding the reported back spasms. He did so, and Dr. Tucker recommended physical therapy and ordered an MRI. That MRI—performed in December 2023—again showed disc bulges, herniations, and a disc protrusion in the same anatomical area as the 2015 injury.[11]

Between December 2023 and March 2024, Ferrell visited Dr. McPhatter, who performed chiropractic treatment, and Dr. Park, who recommended that Ferrell receive an injection. Ferrell declined the injection in his back and was ultimately placed on modified duty with Wilmington FD on March 6, 2024. After Wilmington FD denied liability for Ferrell's workers' compensation claim, Ferrell filed a petition with the Board to determine coverage.

## C.  The IAB proceedings

The Board held an evidentiary hearing to resolve Ferrell's petition. During his testimony, Ferrell described the October 6, 2023 incident as feeling "a little pop in [his] back,"[12] which resulted in pain "way more intense than any pain" he felt following the 2015 incident.[13] Ferrell described the pain in his back as "shooting

---

[11] The parties disagree as to whether the results of the December 2023 MRI showed expected progression of the prior injury or worsening due to the October 6, 2023, incident.

[12] A42 at 14:10 (IAB Hr'g Tr.).

[13] A52 at 24:19–21 (IAB Hr'g Tr.).

through [his] chest."[14] Ferrell also testified that he experienced minimal back pain between the 2015 and 2023 incidents, although he acknowledged that he suffered back spasms and significant pain for several weeks following the 2021 car accident.

The Board also received testimony from Ferrell's family physician, Dr. Tucker, and Wilmington FD's medical expert, Dr. Matz—who is an orthopedic surgeon. The parties' experts offered conflicting opinions as to whether the October 6, 2023 incident was a new injury, an aggravation of the 2015 spinal injury, or a recurrence of the 2015 spinal injury.

Ultimately, the Board concluded that the 2023 incident was a recurrence of the injury that Ferrell sustained in 2015. In reaching that conclusion, the Board placed significant weight on Dr. Matz's opinion and testimony. The Board found that the 2023 incident did not aggravate the 2015 injury and did not cause a new, separately compensable injury to Ferrell. The Board agreed with Dr. Matz that a comparison of Ferrell's MRIs showed the expected progression of spinal deterioration from the 2015 injury, and the Board found that the act of walking up the stairs carrying the high-rise packs was not enough to create a "genuine intervening event."[15] The Board therefore held that liability for the 2023 incident

---

[14] *Id.* at 24:10 (IAB Hr'g Tr.).

[15] A21 (IAB Decision).

6

would remain under the 2015 claim and denied Ferrell's petition for workers' compensation coverage from Wilmington FD.

## D. Ferrell appeals to the Superior Court

Ferrell appealed the IAB's decision to the Superior Court, advancing the same arguments that he raises on appeal. The Superior Court affirmed the Board's findings, holding that *Nally*[16] was the correct standard to apply under the circumstances and that the Board's decision was supported by substantial evidence. In so holding, the Superior Court rejected Ferrell's reliance on *Duvall v. Charles Connell Roofing*,[17] in which this Court adopted a "substantial causation" standard for cases in which the Board must determine whether a claimant who suffers from a pre-existing condition may make a claim for workers' compensation when a work event exacerbates the preexisting injury or condition.[18]

This appeal followed.

---

[16] *See Nally*, 630 A.2d at 641, 646.

[17] 564 A.2d 1132, 1133 (Del. 1989) (finding that under the usual exertion rule, "an injury is compensable if the ordinary stress and strain of employment is a substantial cause of the injury").

[18] *Id.* at 1132 (holding "that [the] 'unusual exertion' rule, under which employee who aggravates preexisting physical weakness is denied compensation unless it can be shown that employee was engaged in some form of unusual exertion at time of job related injury, would be abandoned, and 'usual exertion' rule, under which injury is compensable if ordinary stress and strain of employment is substantial cause of injury, would be adopted").

7

## II.    STANDARD OF REVIEW

"Generally, this Court's review of a decision of the Board is limited to a determination of whether there is substantial evidence to support the Board's findings."[19]  "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[20]  Substantial evidence is "more than a scintilla but less than a preponderance of the evidence."[21]  It is the Board who holds the exclusive function of "[w]eighing the evidence, determining the credibility of witnesses, and resolving any conflicts in the testimony . . . ."[22]  We review alleged errors of law *de novo*.[23]

## III.    ANALYSIS

Ferrell's primary argument on appeal raises a legal issue: whether the Board improperly applied the *Nally* standard, which examines whether an injury was a recurrence or an aggravation of a previously compensated injury, as opposed to the *Duvall* standard, which examines whether the exacerbation of a pre-existing condition was substantially caused by a work accident.  Although the standards appear closely related, they address different issues and policy concerns.  Ferrell's

---

[19] *Betts v. Townsends, Inc.*, 765 A.2d 531, 533 (Del. 2000) (citation omitted).

[20] *Elzufon, Austin, Tarlov & Mondell, P.A. v. Lewis*, 309 A.3d 424, 430 (Del. 2023) (quoting *Oceanport Indus., Inc. v. Wilmington Stevedores, Inc.*, 636 A.2d 892, 899 (Del. 1994)).

[21] *Breeding v. Contractors-One, Inc.*, 549 A.2d 1102, 1104 (Del. 1988) (citation omitted).

[22] *Noel-Lisziewicz v. La-Z-Boy*, 68 A.3d 188, 191 (Del. 2013) (citation omitted).

[23] *Elzufon*, 309 A.3d at 430.

second argument, which challenges the factual support for the Board's conclusions, fails under the highly deferential standard of review that we apply to the IAB's factual findings.

## A.    The Board correctly applied the *Nally* standard.

The Board correctly understood the issue in this case as determining whether to assign liability for Ferrell's 2023 back injury to Wilmington FD or Belvedere. Under those circumstances, *Nally* applied.  The standard that this Court announced in *Nally* assigns liability between successive insurance carriers in cases where an employee seeks compensation for a work-related injury that is causally related to an injury compensated by a previous employer or carrier.[24]

Nally was a beer delivery driver who sustained a back injury when several kegs of beer fell on him.[25]  Nally filed a petition and received workers' compensation benefits from the employer's insurance carrier.  While he was recovering from the injury, Nally's employer switched to a new insurance carrier.  Shortly after returning to work, Nally attempted to unload a keg of beer from a truck and suffered further back pain and symptoms.  Nally filed a workers' compensation petition with the new insurance carrier for the back symptoms that followed the second incident.

---

[24] The analysis under *Nally* applies to successive employers and their respective carriers or to a single employer who has switched insurance carriers.

[25] *Nally*, 630 A.2d at 641.

The question that we resolved in *Nally* was which carrier would be responsible for the symptoms that Nally experienced after the second incident. We held:

> The rule we endorse for determining successive carrier responsibility in recurrence/aggravation disputes places responsibility on the carrier on the risk at the time of the initial injury when the claimant, with continuing symptoms and disability, sustains a further injury unaccompanied by any intervening or untoward event which could be deemed the proximate cause of the new condition. On the other hand, where an employee with a previous compensable injury has sustained a subsequent industrial accident resulting in an aggravation of his physical condition, the second carrier must respond to the claim for additional compensation.[26]

This Court went on to define a "recurrence" as "the return of an impairment without the intervention of a new or independent accident."[27] Conversely, we defined an "aggravation" as making the condition worse and more severe than it was before the event.[28] Using this framework, this Court agreed that Nally's injury was a recurrence of his earlier injury. The decision in *Nally* reversed the Superior Court's conclusion that a recurring injury—which results from the performance of normal duties—should be considered a new injury.[29]

Ferrell's petition required the Board to answer the question to which *Nally* applies: which carrier should be liable for the second injury to Ferrell's back? In

---

[26] *Id.* at 646 (citations omitted).

[27] *Id.* at 644 (quoting *DiSabatino & Sons, Inc. v. Facciolo*, 306 A.2d 716, 719 (Del. 1973)).

[28] *Id.* at 645.

[29] *Id.* at 641, 643.

10

applying *Nally*, the Board needed to resolve three issues. First, the Board needed to decide whether the 2023 injury was a new injury that was wholly unrelated to the 2015 injury.[30] Next, if the 2023 injury was not new and instead was related to the 2015 injury, the Board needed to determine whether the 2023 injury was a recurrence or an aggravation of the 2015 injury. Finally, the Board needed to determine if Ferrell's October 6, 2023 incident was an untoward event that would be considered an intervening incident from the 2015 injury.[31]

The determination that Ferrell's injury was not a new injury and was related to the 2015 claim was likely the most straightforward question for the Board, and Ferrell does not expressly contest the Board's conclusion that the injuries were related. The area of concern for Ferrell's injury was primarily isolated to the same part of his spine and involved the same type of injury that he suffered in 2015—bulges and herniations of the same spinal discs. The more difficult question before the Board was whether the 2023 incident caused a recurrence or an aggravation of Ferrell's 2015 injury.[32] The Board relied on the evidence presented and determined that the 2023 incident was a recurrence.

---

[30] If the determination was made that Ferrell suffered a completely new injury—unrelated to the 2015 claim—*Nally* would likely not be the appropriate analysis for the new claim.

[31] *See Barkley v. Johnson Controls*, 2003 WL 187278, at \*2 (Del. Super. Jan 27, 2003) ("The Board must first determine whether the [incident] constituted an intervening or untoward event." (citing *Nally*, 630 A.2d at 645)).

[32] *Nally*, 630 A.2d at 645 ("The difficulty in successive accidental injury cases is distinguishing between recurrence and aggravation in the legal sense.").

Still, even if the Board found that Ferrell's injury was an aggravation of the 2015 injury, the Board did not find that the 2023 incident was such that the aggravation was caused by an "intervening or untoward event which could be deemed the proximate cause of the new condition."[33]  Indeed, for a subsequent carrier to be held liable for an employee's work-related injury, the new incident must have been "the producing cause of an industrial accident resulting in [a] changed physical condition."[34]  Furthermore, for the second (or subsequent) carrier to be liable for an aggravation, the employee's "new injury or worsening of [their] previous injury [must be] attributable to an untoward event."[35]  Accordingly, Ferrell's claim failed under two prongs of the *Nally* standard.

Ferrell's reliance on *Duvall* rather than *Nally* is misplaced. The *Nally* standard pertains to assigning liability between two carriers when two work-related incidents result in injuries to the same area of the body.  In contrast, the standard announced in *Duvall* relates to whether an employee with a pre-existing condition should be

---

[33] *Id.* at 646; *see also* A22 (IAB Decision) (finding that the act of carrying the high rise packs up the stairs was insufficient to serve as a genuine "intervening or untoward event which could be deemed the proximate cause of the new condition").

[34] *Nally*, 630 A.2d at 641.

[35] *Id.* at 645.

compensated at all when the employee is injured at work and the same injury may not have been sustained by an employee without the medical predisposition.[36]

Duvall was a roofer who suffered from a congenital condition that predisposed him to weakness in his spine. Although Duvall worked as a roofer for many years without issue, he sustained a back injury while unloading an eighty-pound bundle of shingles. The question before this Court was whether Duvall could obtain workers' compensation since he was only using "usual exertion" when he sustained the injury, even though the stress and strain of his employment was the substantial cause of his back injury.

In *Duvall*, this Court abandoned the "unusual exertion" standard previously applied in similar cases and held that "an injury is compensable if the ordinary stress and strain of employment is a substantial cause of the injury," regardless of a claimant's pre-existing condition or disposition to injury.[37] In announcing the new standard, the *Duvall* court explained that the rule was more consistent with the purpose of Delaware's Workers' Compensation Law, which is to assure prompt

---

[36] *Duvall*, 564 A.2d at 1135 (explaining that the "application of the unusual exertion rule produces arbitrary, inequitable and often ridiculous results" between employees with a pre-existing condition and without).

[37] *Id.* at 1133, 1136.

13

compensation and avoid litigation.[38]  Then, as now, the Court interpreted the

Workers' Compensation Law liberally to fulfill its "intended compensation goal."[39]

The *Duvall* standard allows for compensability when work-related activities

are the substantial cause of an injury.  *Duvall* permits medically pre-disposed

claimants to seek compensation when they are injured at work, something that they

could not do before *Duvall* without establishing that they were engaging in an

"unusual exertion."  *Nally*, in contrast, assigns liability between employers (or

carriers) when an employee suffers serial work-related injuries.  The *Nally* standard

is informed by different policy concerns from those at issue in *Duvall*.  As we

explained in *Nally*:

> In successive carrier disputes where compensability is conceded, as here, the determination is one of liability between carriers. That determination, posing different policy concerns, should not turn on whether unusual exertion is present but whether a genuine intervening event has occurred which brings out a new injury. Carrier liability should be fixed on primary responsibility for risks as they arise and, as a matter of policy to avoid delay and confusion, should continue as long as the consequences of that injury are present. [40]

---

[38] *Id.* at 1133 ("It is fundamental that the two primary purposes of the Delaware Workmen's [sic] Compensation Law, 19 *Del. C.* Ch. 23 (1985), are to assure prompt compensation of injured employees without regard to fault and to obviate the need for litigation." (citing *Champlain Cable Corp. v. Employers. Mut. Liab. Ins. Co. of Wisconsin*, 479 A.2d 835, 840 (Del. 1984))).

[39] *Id.* at 1134.

[40] *Nally*, 630 A.2d at 645 (citing *Pennsylvania Mfr.'s Assn. Ins. Co. v. Home Ins. Co.*, 584 A.2d 1209 (Del. 1990)).

In other words, the *Nally* standard does not typically leave a worker without compensation. Its application did so here only because of Ferrell's commutation. That unusual result does not mean that the Board applied the wrong standard.

Nor does Ferrell's testimony that he was without symptoms for several years convert his 2015 claim into a dormant pre-existing condition under *Duvall*. Ferrell knew when he commuted his 2015 claim that the injury was unlikely to completely heal. Indeed, in 2017 Ferrell "received a settlement for 6% permanency to [his] cervical spine and 5% permanency to [his] thoracic spine."[41] This settlement expressly acknowledged the "permanency" of his injury. That Ferrell was symptom free for a period of time is not an indication that his injury was healed.

## B. The Board's decision was supported by substantial evidence.

In resolving Ferrell's second claim on appeal, we must determine whether the Board's decision was supported by substantial evidence. Substantial evidence is relevant evidence that a "reasonable mind might accept as adequate to support a conclusion."[42] Substantial evidence has been described as "more than a scintilla but less than a preponderance of the evidence."[43]

---

[41] A62 at 34:19–21 (IAB Hr'g Tr.).

[42] *Elzufon*, 309 A.3d at 430 (quoting *Oceanport Indus.*, 636 A.2d at 899).

[43] *Breeding*, 549 A.2d at 1104.

In making its decision, the Board heard testimony from Ferrell, reviewed medical records, and was permitted to rely on whichever medical expert that it found credible.[44] Although Ferrell compared and distinguished the pain and symptoms he experienced in 2015 and 2023, the Board's analysis under *Nally* "is not whether [Ferrell's] pain or other symptoms have returned but whether there has been a new injury or worsening of a previous injury attributable to an untoward event."[45] This determination is well suited to expert testimony. The Board heard contrasting medical opinions from Dr. Tucker and Dr. Matz, both of whom relied on their physical evaluations of Ferrell and their comparisons of his 2015 and 2023 MRIs.

An MRI performed in 2015 after the initial Belvedere accident showed "evidence of degenerative changes to [Ferrell's] thoracic spine as well as bone spurs on the discs at T5-T6, T7-T8, and T8-T9. The 2015 MRI also showed broad-based central disc protrusion, moderate central canal stenosis at T6-T7, and searing of some of the spinal canal from T6-T7 to T8-T9."[46] One of Ferrell's treating physicians concluded that the MRI additionally "showed multiple disc bulges and a disc herniation at T5-T6, with significant central canal stenosis, compression of the

---

[44] *See Elzufon*, 309 A.3d at 431 ("The IAB may adopt the opinion testimony of one expert over another; and that opinion, if adopted, will constitute substantial evidence for purposes of appellate review." (quoting *Person-Gaines v. Pepco Holdings, Inc.*, 981 A.2d 1159, 1161 (Del. 2009))).

[45] *Nally*, 630 A.2d at 645.

[46] A19 (IAB Decision).

16

spinal cord, and a small area of myelomalacia."[47]   Based on those results, Dr. Bandera—a physical medicine and rehabilitation specialist—assigned Ferrell's "thoracic spine a 10% permanency rating."[48]

After the 2023 incident, Ferrell underwent another MRI.  The 2023 "MRI report found that [Ferrell] had a protrusion at T5-T6; broad-based herniations at T6-T7, T7-T8, and T8-T9; cord atrophy at T7-T8 and T8-T9; a bulge, with bilateral facet disease at T9-T10; and a bulge, bilateral facet disease, and mild to moderate narrowing at T10-T11."[49]  Those findings covered almost the same anatomical area as the 2015 injury.  The Board heard testimony from Dr. Matz, who compared the MRIs and concluded that the results showed that Ferrell's 2023 incident was a recurrence of the 2015 claim.

Dr. Matz is an orthopedic surgeon whom the Board found credible.  In Dr. Matz's opinion, the results of Ferrell's MRIs showed that his condition was degenerative, not acute, and "the sort of progression that you would expect with the natural aging process."[50]  The Board agreed that the MRIs—performed eight years apart—may have shown some worsening in Ferrell's condition, but the progression

---

[47] *Id.*

[48] *Id.*; Ferrell ultimately settled for 6% permanency to his cervical spine and 5% permanency to his thoracic spine. A62 at 34:19–21 (IAB Hr'g Tr.).

[49] A20 (IAB Decision).

[50] A211–12 at 35:20–36:20 (Dr. Matz Dep. Tr.).

was expected.[51] The Board accepted Dr. Matz's expert opinion that Ferrell's condition was degenerative and a "slowly progressive thoracic disc disease."[52]

In finding that the 2023 incident was not an untoward event, the Board highlighted the following from Dr. Matz's deposition:

> The history [Ferrell] gave me, you know, described what I would consider to be the normal job duties of a firefighter: going up and down stairs, even racing up stairs. He did not tell me he fell down the stairs; he did not tell me that, you know, he was struck by somebody and knocked over; and, quite frankly, he did not tell me that he felt a pop or anything like that, which was in another [medical record]. He described that he developed mid back pain that went to his chest . . . . So the kind of symptoms and complaints he had subsequent to October 6th, 2023, in my opinion, are consistent with what one would expect from prior injuries and slowly progressive thoracic disc disease.[53]

The Board relied on Dr. Matz and agreed that the act of walking up the stairs while carrying the equipment was not enough to create the progressive injury shown on Ferrell's MRIs. As Dr. Matz testified, Ferrell's injury was indicative of an ongoing degenerative process rather than a discrete incident.

Finally, the Board justified its reliance on Dr. Matz throughout its decision and found that his opinion was credible and supported by his evaluation of Ferrell and the medical records. The fact that the Board relied on Dr. Matz and not Ferrell's

---

[51] A17 (IAB Decision) ("According to Dr. Matz, the kinds of symptoms and complaints of back pain . . . are consistent with what one would expect from the injuries which [Ferrell] sustained well before October 2023 and [Ferrell's] slowly progressive thoracic disc disease.").

[52] *Id.*

[53] A20–21 (IAB Decision); A220–21 at 44:24–45:21 (Dr. Matz Dep. Tr.).

18

own testimony or Dr. Tucker's opinion does not mean that the Board's decision lacked substantial evidence.

## IV.       CONCLUSION

For the foregoing reasons, we **AFFIRM** the Superior Court's opinion.