Unified Judicial System

 

 
 
Truck Insurance Exchange
Plaintiff and Appellee
v.
CNA Defendant and Appellee
and
Dodson Insurance Group
Defendant and Appellant
[2001 SD 46]
South Dakota Supreme Court
Appeal from the Circuit Court of The Second Judicial Circuit
Minnehaha County, South Dakota
Hon. Glen A. Severson, Judge
Kristine L. Kreiter Woods, Fuller, Shultz & Smith Sioux Falls, South Dakota
Attorneys for appellee
Truck Insurance Exchange
 
Patricia A. Meyers Costello, Porter, Hill, Heisterkamp, Bushnell & Carpenter Rapid City, South Dakota 
Attorneys for appellee CNA
 
Kristi Geisler Holm and Timothy M. Gebhart Davenport, Evans, Hurwitz & Smith Sioux Falls, South Dakota
Attorneys for appellant Dodson Insurance Group
 
Considered on Briefs November 28, 2000
Opinion Filed 4/11/2001

#21399, 21406
BASTIAN, Circuit Judge
 
[Â¶1.] Dodson Insurance Group (Dodson) appeals trial court orders holding it solely liable for all workersâ compensation benefits pertaining to work-related injuries sustained by Phyllis Kubal (Kubal) at the Yankton Medical Clinic.  Kubal's repetitive work activities eventually resulted in trapezium implants in both thumbs.  The trial court discharged CNA and Truck Insurance Exchange (Truck) from liability.  We affirm.
[Â¶2.] This is the second time this case has come before this Court.  In Truck Ins. Exchange v. Kubal, 1997 SD 37, 561 NW2d 674, Truck petitioned for a hearing before the Department of Labor to recover from Dodson and CNA for benefits it had paid to Kubal or, alternatively, to have the benefits apportioned among the insurers.  On appeal, we held that the circuit court properly dismissed the petition for lack of subject matter jurisdiction.
[Â¶3.] Truck subsequently commenced a civil action and moved for summary judgment against CNA and Dodson.  Truck claimed that Kubal's injuries to her thumbs, which arose out of and in the course of her employment at the clinic, were present prior to October 1, 1992 when Truck came onto the risk as the Clinic's workersâ compensation insurer.  Truck further claimed that Kubal's subsequent complaints and the treatment of her thumbs did not represent a new injury or an aggravation of a prior injury or condition.  Dodson also moved for summary judgment claiming that Kubal's employment activities after October 1990, when Dodson was no longer on the risk, independently contributed to and aggravated her condition.  The trial court granted summary judgment to Truck and denied summary judgment to Dodson.
[Â¶4.] Dodson later moved for summary judgment against CNA making the same claim it previously urged against Truck.  CNA also moved for summary judgment.  The trial court denied both motions finding the existence of material issues of fact.  Both parties subsequently waived trial and submitted the case to the trial court on the record.  The court discharged CNA from all liability and found that Dodson was liable for all workersâ compensation benefits related to Kubal's thumb injuries occurring at the Clinic.
[Â¶5.] Dodson has appealed the adverse rulings by the trial court.  CNA has filed a notice of review claiming the trial court erred when granting summary judgment in favor of Truck.
FACTS
[Â¶6.] All factual issues presented in this appeal were submitted to the trial court on the record.  We review findings based on deposition testimony and documentary evidence under a de novo standard of review.  Wagaman v. Sioux Falls Const., 1998 SD 27, Â¶12, 576 NW2d 237, 240.  From this review, we elicit the following facts.
[Â¶7.] In 1981, Kubal began her employment with the Yankton Medical Clinic (Clinic) in the medical records department performing clerical duties.  During her employment, the Clinic changed workersâ compensation insurers several times.  Dodson provided coverage from October 1, 1989 to October 1, 1990; CNA provided coverage from October 1, 1990 to October 1, 1992; and Truck provided coverage from October 1, 1992 through the relevant time in question.  
[Â¶8.] Prior to February 1990, Kubal experienced a tingling and numbness in her left hand that caused her pain and discomfort.  The onset was not sudden; her condition became progressively worse over time.  She testified that she also had problems with her right thumb that were concurrent with the problems in her left hand but that "the apparent, the more severe pain" was in her left hand because of its dominance.    
[Â¶9.] In February 1990, Kubal consulted Dr. Robert Neumayr, one of the Clinic physicians, about the hand problems she had been experiencing for more than a month.  However, Kubal did not complain to Dr. Neumayr about her right thumb pain.  Dr. Neumayr later testified that, to a degree of reasonable medical certainty, the repetitive nature of Kubal's employment duties caused the condition in her left hand.[1]  
[Â¶10.] During the February 1990 visit, Kubal told Dr. Neumayr that her pain was made worse by work.  Dr. Neumayr ordered an x‑ray of her left hand.  In Dr. Neumayr's opinion, the x‑ray showed arthritis in Kubal's joints.  Dr. Neumayr also testified that he was not surprised that Kubal had bilateral trouble because she used both hands for repetitive activities in her work.
[Â¶11.] Kubal was able to continue working without restrictions at the Clinic but experienced the same symptoms in her hands for the next two years.  Eventually, as the condition of her hands worsened, she complained again.
[Â¶12.] Kubal also suffered from a recurring back problem and, in July 1992, Dr. Neumayr referred her to Dr. Marques Rhoades, an orthopedic surgeon.  During her first consultation, Kubal complained of pain and numbness in her hands, the left being worse than the right.  X-rays showed degenerative changes in the metacarpal joints of both thumbs.  Dr. Rhoades performed a nerve conduction study on both hands and found that Kubal had bilateral carpal tunnel syndrome with a more severe condition in her left hand.  
[Â¶13.] After being specifically asked when the thumb problem first manifested itself, Dr. Rhoades was unable to give a definitive answer.  He stated, "Oh, it would have been sometime around 1992, I would say . . . if Dr. Neumayr took some x‑rays in 1990 she must have been having some pain then.  I don't know, I can't comment for him, but it could have been the carpal tunnel or it could have been early arthritis that just wasnât manifest by an x-ray yet."
[Â¶14.] Kubal had carpal tunnel surgery on the left hand in September 1992.[2]   Following surgery, the thumb pain became much more apparent, but remained the same familiar pain that Kubal had been experiencing since February 1990.  When Kubal returned to Dr. Rhoades in November 1992 to renew her complaints about her thumbs, Dr. Rhoades found crepitation and pain in the metacarpal joints of both thumbs.  Dr. Rhoades concluded that Kubal's thumb pain had existed concurrently with the carpal tunnel pain, but was masked by the carpal tunnel pain until Kubal underwent surgery for that condition.  Trapezium implants were performed on Kubalâs thumbs during two separate surgeries in 1993.  
[Â¶15.] Other facts will be discussed as necessary below.
DECISION
[Â¶16.] This case requires the application of the "last injurious exposure rule."  The rule applies when considering successive injuries.  Under that rule,  
When a disability develops gradually, or when it comes as the result of a succession of accidents, the insurance carrier covering the risk at the time of the most recent injury or exposure bearing a causal relation to the disability is usually liable for the entire compensation.  
 
Schuck v. John Morrell & Co., 529 NW2d 894, 900 (SD 1995) (quoting Novak v. C.J. Grossenburg and Son, 89 SD 308, 311, 232 NW2d 463, 464-65 (1975)).  
[Â¶17.] The application of the last injurious exposure rule to a particular claim is based on a factual determination: whether the successive injury is a mere recurrence or an independent aggravation of the first injury.  
In successive injury cases, the original employer/insurer remains liable if the second injury is a mere recurrence of the first.  If the second injury is an aggravation that contributes independently to the final disability then the subsequent employer/insurer is liable.  
 
Schuck, 529 NW2d at 900.  
[Â¶18.] The distinction between the meaning of these two concepts is gray.  Enger v. FMC,  1997 SD 70, Â¶ 17, 565 NW2d 79, 84.  "'If the second injury takes the form merely of a recurrence of the first, and if the second incident does not contribute even slightly to the causation of the disabling condition, the insurer on the risk at the time of the original injury remains liable for the second.'"  Id. (quoting 9 Arthur Larson, Larson's Workmen's Compensation Law Â§ 95.23.)  
[Â¶19.] Causation must be established to a reasonable medical probability, not just a possibility.  Enger, 1997 SD 70 at Â¶ 18, 565 NW2d at 85.  When the medical evidence is not conclusive, the claimant has not met the burden of showing causation by a preponderance of the evidence.  Id.
[Â¶20.] The core issue in this case is whether Kubal's disability was a recurrence or an aggravation of the injury she reported in February 1990.  In making this determination there are certain guidelines.  To determine that an injury was an aggravation of a prior episode, the evidence must show: 1) a second injury as that term is used in this jurisdiction; and 2) that this second injury contributed independently to the final disability.  Paulson v. Black Hills Packing Co., 1996 SD 118, Â¶ 12, 554 NW2d 194, 196.  To determine that the second episode was a recurrence of the prior injury the evidence must show: 1) there have been persistent symptoms of the injury; and 2) no specific incident that can independently explain the second onset of symptoms.  Id.  Because an injury is a subjective condition, an expert opinion is required to establish a causal connection between the incident or injury and disability.  Day v. John Morrell & Co., 490 NW2d 720, 724 (SD 1992).

[Â¶21.]               Whether the trial court erred in granting summary judgment to Truck and denying summary judgment to Dodson?
 
[Â¶22.] Truck moved for summary judgment against CNA and Dodson claiming that Kubal's thumb injuries were present prior to the time that Truck came onto the risk and that Kubal's subsequent complaints and treatment did not represent a new injury or an aggravation of a prior injury or condition.  Dodson moved for summary judgment claiming that Kubal's employment activities after October 1990, when Dodson was no longer on the risk, independently contributed to and aggravated her condition.  The relevant evidence consisted of the depositions of Kubal and Dr. Rhoades.[3]  
[Â¶23.] Our standard of review for a circuit courtâs grant of a motion for summary judgment is well settled.
âSummary judgment shall be granted âif the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.â  We will affirm only when there are no genuine issues of material fact and the legal questions have been correctly decided.  All reasonable inferences drawn from the facts must be viewed in favor of the nonmoving party.  The burden is on the moving party to clearly show an absence of any genuine issue of material fact and an entitlement to judgment as a matter of law.  On the other hand, â[t]he party opposing a motion for summary judgment must be diligent in resisting the motion, and mere general allegations and denials which do not set forth specific facts will not prevent issuance of a judgment.ââ
 
Zuke v. Presentation Sisters, Inc., 1999 SD 31, Â¶ 14, 589 NW2d 925, 928 (quoting Greene v. Morgan, Theeler, Cogley & Petersen, 1998 SD 16, Â¶6, 575 NW2d 457, 459)). 
[Â¶24.] We find that the trial court properly granted summary judgment in favor of Truck.  In July 1992, Kubal complained of pain and numbness in her hands, the left being worse than the right.  X-rays showed degenerative changes in the metacarpal joints of both thumbs.  After carpal tunnel surgery in September 1992, her thumb pain became much more apparent but remained the same familiar pain that she had experienced since February 1990.  In November 1992, Dr. Rhoades found crepitation and pain in the joints of both thumbs.  Dr. Rhoades concluded that Kubal's thumb pain had existed concurrently with the carpal tunnel pain. 
[Â¶25.] Viewing the facts and all reasonable inferences in a light most favorable to the nonmoving parties and applying the last injurious exposure rule, there is no credible evidence to suggest that Kubal sustained any successive thumb injury or aggravation after October 1, 1992 when Truck came on the risk.  
[Â¶26.] The trial court also properly denied summary judgment to Dodson.  The evidence, when viewed most favorably to Truck and CNA, fails to show that Kubal sustained a second injury after October 1990 or that her continuing employment activities independently contributed to her condition.    
[Â¶27.]               Whether the trial court erred in determining that Dodson was liable for Kubal's thumb injuries?
 
[Â¶28.] In determining successive carrier responsibility in recurrence/aggravation disputes, the "burden of proving the causative effect of the second event is upon the initial carrier seeking to shift responsibility for the consequences of the original injury."  Standard Distributing Co. v. Nally, 630 A2d 640, 646 (Del 1993); see also 8 Arthur Larson et al., Larson's Workers' Compensation Law Â§ 131.03[3][c] (2000) (burden of proof of showing a change in condition is normally on the party, whether claimant or employer, asserting the change).  
[Â¶29.] Kubal stated the pain in her left thumb as well as numbness and tingling in her left hand prompted her to see Dr. Neumayr in February 1990.  Kubal also stated the problems with her right thumb existed concurrently with the problems in her left hand. Dodson was the workers' compensation insurer for the Clinic at the time Kubal first sought treatment in February 1990.  Because Dodson asserted that a change in Kubal's condition occurred during the time that CNA was the insurer for the Clinic, Dodson had the burden of proof on the issue.
[Â¶30.] The trial court found that Dodson failed to meet its burden of establishing an aggravation in either of Kubal's thumbs and concluded that Dodson was liable for Kubalâs workers' compensation benefits.  We agree.
[Â¶31.] Liability may be shifted to CNA only if Dodson can prove an aggravation.  Dodson "remains liable if the second injury is a mere recurrence of the first."  Schuck, 529 NW2d at 900.  Evidence that an injury merely worsened is not sufficient to prove aggravation.  Enger, 1997 SD 70 at Â¶ 18, 565 NW2d at 84-85.
[Â¶32.] Kubal testified that, in February 1990, she "recognized the thumb pain was definitely there but it was just ‑‑ to me it was just the left hand and the thumb probably in particular" because she is left-hand dominate.  Dr. Neumayr testified that the x-ray of her hand showed "more than would be expected from wear and tear and that there was some arthritis."  Kubal also testified that her right thumb discomfort was concurrent with the pain in her left hand in 1990.  
[Â¶33.] Kubal experienced basically the same symptoms from 1990 through 1992.  When Kubal reported the pain to Dr. Rhoades in 1992, it was secondary to an unrelated back condition.  Dr. Rhoadesâ report of July 15, 1992 indicates that Kubal complained of "pain and numbness in the hands, left greater than the right," and an x‑ray found degenerative changes in both thumbs.  After Kubal's surgery in September 1992, the thumb pain became much more apparent after the carpal tunnel pain had been eliminated, but the thumb pain was not new; it was the same thumb pain that had existed since 1990.  The examination by Dr. Rhoades in November 1992 again found joint pain in both thumbs.
[Â¶34.] Neither Dr. Neumayr nor Dr. Rhoades was able to provide an opinion that Kubal's work activities after October 1, 1990 caused an aggravation of her thumb injuries.[4]   Moreover, the physicians' testimony fails to address whether Kubal's post‑1990 work caused a second injury.  There is no evidence to show that Kubal's continued use of her hands during employment subsequent to the time that Dodson was on the risk contributed even slightly to the cause of the disability.  See Enger, 1997 SD 70 at Â¶ 9, 565 NW2d at 83.  The disability was already in existence at the time Dodson left the risk.  Id.  
[Â¶35.] Furthermore, the evidence shows that Kubal's successive thumb injuries were a recurrence under the last injurious exposure rule.  First, Kubal had persistent symptoms of the injuries.  Paulson, 1996 SD 118 at Â¶ 12, 554 NW2d at 196.  As previously discussed, Kubal testified that she was basically having the same kinds of symptoms in 1992 as in 1990 when Dodson was the workers' compensation carrier.  It was not new pain, but was familiar.  Essentially, Kubal testified that her right thumb pain was concurrent with the pain in her left hand.  Second, there is no evidence of any specific incident that could independently explain the onset of the symptoms.  Id.
[Â¶36.] Affirmed.
[Â¶37.] MILLER, Chief Justice, AMUNDSON, KONENKAMP and GILBERTSON, Justices, concur.
[Â¶38.] BASTIAN, Circuit Judge, for SABERS, Justice, disqualified.

 1.         Contrary to the argument advanced in Dodson's brief, Dr. Neumayr did not testify that "the repetitive nature of Mrs. Kubal's work after October 1, 1990, contributed independently to her left thumb condition."  Rather, Dr. Neumayr merely stated that the period after October 1, 1990 is included in the time frame during which Kubal's condition was adversely affected by her employment duties.  He further testified that he could not state that Kubal had no injury to her right hand prior to October 1, 1990.
 

 2.         CNA, then the Clinic's workersâ compensation insurer, accepted liability for the surgery.

 3.         The deposition of Dr. Robert Neumayr was taken after the motions were decided.
 

 4.         Dodson argues in its brief that Dr. Rhoades testified that Kubal's condition was aggravated by her employment.  However, when viewed in context, it is clear that Dr. Rhoades was not applying the legal definition of the term but was testifying that her condition was made worse by continued work.