2003 SD 22

**Jill TITUS, Employee/Claimant
and Appellant,**

v.

**SIOUX VALLEY HOSPITAL,
Employer/Self–Insurer
and Appellee.**

**No. 22243.**

Supreme Court of South Dakota.

Considered on Briefs on May 28, 2002.

Reassigned Dec. 16, 2002.

Decided Feb. 26, 2003.

Kristi Geisler Holm of Davenport, Evans, Hurwitz & Smith, Sioux Falls, South Dakota, Attorneys for employer/self-insurer and appellee.

SABERS, Justice (on reassignment).

[¶ 1.]  Jill Titus appeals from a circuit court decision overruling the Department of Labor's holding that she was entitled to worker's compensation benefits.  The employer, Sioux Valley Hospital (Sioux Valley), self insures its worker's compensation risk. We reverse.

## FACTS

[¶ 2.]  Titus began working at Sioux Valley in 1989 as a surgical technician.  On August 20, 1992, while setting up for surgery, she was lifting a 44 pound piece of surgical equipment when she injured her back.  Titus finished her shift but then stayed home from work for a few days to rest the injury.  She reported the injury to Sioux Valley on the morning following her injury and was referred to Dr. David Hoversten, who diagnosed her with acute back strain, a diagnosis he later admitted was incorrect.

[¶ 3.]  A CAT scan revealed a mild bulging of the disc at the L4–L5 and L5–S1 level.  The disc was not herniated.  Dr. Hoversten treated Titus conservatively.  She was put on a 30–pound weight lifting restriction and was advised not to bend or twist.  She was placed on drugs and began physical therapy.  While these initial measures brought her some pain relief, Titus continued to experience pain.

[¶ 4.]  In February 1995, Titus returned to Dr. Hoversten complaining of increased back pain.  Dr. Hoversten ordered an MRI which showed a slight central disc bulge with "marked desiccation of the disc."  Dr. Hoversten believed that Titus would require back surgery within six to ten years.

[¶ 5.]  In 1995, Titus voluntarily left her job at Sioux Valley and began working as a surgical technician in Idaho.  She held the job in Idaho from October 1995 until April 1997.  Her duties were essentially the same except her work hours were shorter and the cases were usually less complicated.

[¶ 6.]  In January 1997, Titus once again sought medical treatment for continuous back pain.  She complained that the pain radiated to her leg and that she was unable to sit or stand without pain.  She reported to the doctor that her pain was

exacerbated by bending, twisting and lifting and that her back pain had worsened within the past two years. She indicated this worsening was particularly noticeable since December, 1996, a time which had been busier than normal for her. This time she saw Dr. Schneider.

[¶ 7.] After obtaining Titus' medical records, including the 1995 MRI report, Dr. Schneider ordered another MRI in March 1997. This MRI showed a central disc protrusion with moderate central spinal stenosis. The report characterized this finding as a clear progression of the disc disease. The disc was now herniated with the bulge at twice the size it had been in 1995.

[¶ 8.] Since April 1997, Titus has undergone four back surgeries. She has not worked since then. Titus now appeals the circuit court decision denying her worker's compensation benefits on the basis that she suffered an aggravation of her original back injury precluding recovery. She raises one issue on appeal:

> Whether Titus' current injury is a recurrence of her original work injury or an independent aggravation.

We reverse.

## STANDARD OF REVIEW

[¶ 9.] We use a de novo standard of review for department findings which are based on deposition testimony and documentary evidence. *Grauel v. South Dakota School of Mines and Technology,* 2000 SD 145, ¶ 7, 619 N.W.2d 260, 262 (quoting *Wagaman v. Sioux Falls Constr.,* 1998 SD 27, ¶ 12, 576 N.W.2d 237, 240).

[¶ 10.] **WHETHER TITUS' CURRENT INJURY IS A RECURRENCE OF HER ORIGINAL WORK INJURY OR AN INDEPENDENT AGGRAVATION.**

[¶ 11.] In a worker's compensation dispute, the claimant must prove all of the facts essential to compensation by a preponderance of the evidence. *Davidson v. Horton Industries, Inc.,* 2002 SD 27, ¶ 28, 641 N.W.2d 138, 144. In order to meet this burden of proof, it is necessary that the claimant provide medical evidence. *Enger v. FMC,* 1997 SD 70, 565 N.W.2d 79. Titus argues that we have impliedly overruled this precedent and shifted the burden of proof to the employer/insurer in successive injury cases. This argument is based on her reading of *Truck Ins. Exchange v. CNA,* 2001 SD 46, 624 N.W.2d 705. However, that case involved a dispute between successive insurance carriers and is not applicable here.

[¶ 12.] Given that the parties agree that her 1992 back injury was work related, the question is whether Sioux Valley is on the risk for her successive injury. Thus, we apply the last injurious exposure rule. *Novak v. C.J. Grossenburg & Son,* 89 S.D. 308, 232 N.W.2d 463 (1975). Under this rule,

> [w]hen a disability develops gradually, or when it comes as a result of a succession of accidents, the insurance carrier covering the risk at the time of the most recent injury or exposure bearing a causal relation to the disability is usually liable for the entire compensation.

*St. Luke's Midland Regional Medical Center v. Kennedy,* 2002 SD 137, ¶ 19, 653 N.W.2d 880, 885 (citations and quotations omitted).

[¶ 13.] This rule requires us to inquire "whether the successive injury is a mere recurrence or an independent aggravation of the first injury." *St. Luke's,* 2002 SD 137 at ¶ 20, 653 N.W.2d at 886. The original employer or insurer will be liable if the second injury is a recurrence of the first. However, if the second injury is an aggravation that independently contributes

to the final disability, the subsequent insurer or employer is liable. *Id.* (citation omitted).

■ [¶ 14.] To find that the second injury was an aggravation of the first, the evidence must show:

1. A second injury; and
2. That this second injury contributed independently to the final disability.

*Paulson v. Black Hills Packing Co.,* 1996 SD 118, ¶ 12, 554 N.W.2d 194, 196.

■■ [¶ 15.] To find that the second injury was a recurrence of the first injury, the evidence must show:

1. There have been persistent symptoms of the injury; and
2. No specific incident that can independently explain the second onset of symptoms.

*Id.* In *Enger,* we stated, "[w]e look to whether a significant occurrence, amounting to an independent contribution to the final disability, causes an onset of increased or new symptoms." *Enger,* 1997 SD 70 at ¶ 17, 565 N.W.2d at 84 (citations omitted). Just as in *Enger,* this Claimant's disability already existed when she left Sioux Valley Hospital. Her deposition, which the ALJ and her doctors found credible, indicates that she experienced chronic pain from the time of her initial injury until she consulted her first physician in Idaho. Although there is some argument that she had new symptoms, a fair reading of the record is that her pain complaints were consistent and symptoms changed only as the problem naturally progressed. Dr. Hoversten, the only doctor to definitively state that continued employment independently contributed to the injury, had not seen Titus for at least three years and did not know what her job duties in Idaho entailed. Furthermore, Dr. Hoversten anticipated at the time he first saw her that her condition would require surgery within six to ten years.

■ [¶ 16.] Although none of the doctors could affirmatively state that the Claimant's continued employment did not contribute to her disability that is not the test. The question is not whether later employment contributed to her disability, but whether it contributed to the *causation* of her disability. *Enger,* 1997 SD 70 at ¶ 17, 565 N.W.2d at 84 (stating, "the contribution of the second injury, however slight, must be to the *causation* of the disability" (emphasis in the original)). The answer is "no." Here, there have been persistent symptoms of the injury and there is no specific incident that can independently explain the second onset of symptoms. Therefore, she has sustained her burden of proof under *Paulson* and *Enger.*

[¶ 17.] Moreover, at least three of the physicians indicated that her symptoms appeared to be a natural progression of her initial injury. For example, Dr. Schneider, the orthopedic surgeon, stated, "[w]ell it appears to me that she has [had] just a progression of problems since 1992. And I don't think the work out here contributed any more to it than her going to the grocery store and getting something. This is just an ongoing thing that kind of worsened with time, that's how it appears to me." In essence, all of the doctors at some point indicated that her problems in Idaho and eventual need for surgery could have occurred simply because of her normal activities of daily living. This is sufficient to meet her burden of showing causation by the first injury by a preponderance of evidence under *Enger.*

[¶ 18.] Accordingly, this was a continuation, a worsening, a recurrence, not an independent aggravation relieving Sioux Valley Hospital of responsibility. Reversed.

[¶ 19.] GILBERTSON, Chief Justice, and KONENKAMP, Justice, concur.

[¶ 20.] AMUNDSON, Retired Justice, and ECKRICH, Circuit Judge, dissent.

[¶ 21.] MEIERHENRY, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.

[¶ 22.] ECKRICH, Circuit Judge, sitting for ZINTER, Justice, disqualified.

AMUNDSON, Retired Justice (dissenting).

[¶ 23.] As set forth in the majority decision, "we review findings based on deposition testimony and documentary evidence de novo." *Westergren v. Baptist Hosp. of Winner,* 1996 SD 69, ¶ 7, 549 N.W.2d 390, 393. The majority acknowledges that Titus had the burden of proving all of the facts essential to establishing her entitlement to workers' compensation by a preponderance of the evidence. *Davidson, supra.* In this case involving subsequent employment and application of the last injurious exposure rule, this required Titus to prove by a preponderance of the evidence that her disability resulted from a recurrence, rather than an aggravation, of her original injury. *Paulson,* 1996 SD 118 at ¶ 18, 554 N.W.2d at 197. *See also Enger, supra.* In meeting this burden, expert opinions were essential. *Id.* If those opinions were not conclusive, Titus failed in her burden. *Enger,* 1997 SD 70 at ¶ 18, 565 N.W.2d at 85.

[¶ 24.] The expert opinions here were not conclusive on the question of recurrence or aggravation. The only definitive testimony came from Dr. Hoversten who

testified that Titus' subsequent employment in Idaho *did* independently contribute to her disability. The majority discredits Dr. Hoversten's opinion because he had not seen Titus for three years, did not know what her job duties entailed in Idaho and anticipated from the outset that Titus' condition would later require surgery. For these reasons, the majority dismisses sixteen pages of detailed findings of fact and conclusions of law in which the trial court carefully, meticulously and methodically weighed the evidence and explained why it found Dr. Hoversten's testimony "critical" to the outcome. In that very regard, the trial court gave the following summation in rendering its oral decision (incorporated by reference in its findings and conclusions):

> I would also indicate that in my conclusion of rejecting—not rejecting, but finding Hoversten, Henbest, Ball and Zimmerman to be more persuasive than Claimant's physicians, I think it is significant that the Claimant's physicians did not see Claimant after the initial injury. Their history was based upon her subjective complaints or reports. They were—they were in the unadvantageous position of having to examine her after she had already undergone two or more surgeries and most significantly, it doesn't appear that they had reviewed the 1995 MRI, which to me a comparison of the '95 and '97 MRI's is critical in this case.

> Additionally, Dr. Hoversten was the only physician who reviewed all of the medical evidence subsequently generated and for those reasons, I think that the other physicians are more persuasive.*

---

* The trial court subsequently entered the following specific findings as to its reasons for accepting Dr. Hoversten's opinion:

37. Even after cross-examination, Dr. Hoversten maintained the opinion that Claim-

ant's work activities in Idaho independently contributed to her condition and need for surgery.

38. Dr. Hoversten's opinions and testimony are entitled to more weight than those of

[¶ 25.] As for the majority's point that Dr. Hoversten had not seen Titus for several years, Dr. Hoversten explained during his deposition:

Q. [Counsel for Sioux Valley] You were asked to do a records review and provide an opinion?

A. Yeah.

Q. Did you feel it was necessary in order to provide that opinion in light of the objective tests that you had to actually examine Ms. Titus?

[COUNSEL FOR TITUS]: Object as leading.

A. No.

Q. [Counsel for Sioux Valley] Why?

A. The objective tests told me more than anything else and review of records said the doctors found what I would have expected they might find in, what is it, Idaho, wherever she was. Besides, she had already had four back operations. It's going to be hard to tell what it was back in '97.

Q. All right. So do you feel that the lack of having an actual examination of Jill Titus in any way affected your ability to render the opinions that you've given?

[COUNSEL FOR TITUS]: Object as leading.

A. No, I don't.

[¶ 26.] With regard to the majority's contention that Dr. Hoversten, an orthopedic surgeon for sixteen years, was unfamiliar with Titus' job duties as a surgical technician in Idaho, he explained the basis for his opinion testimony as follows:

Q. [COUNSEL FOR SIOUX VALLEY] All right. And your basis concerning her work activities is based upon your knowledge of what a surgical technician in general does; is that correct?

A. Yes.

Q. All right. And if I were to tell you that physicians that were observing her while she was actually performing the job of the surgical technician in Idaho stated that the job involved bending and twisting and lifting, that would be consistent with what your understanding of what a surgical technician position would be?

A. Yes.

Q. And it is involvement in those types of activities, even if you limit it to less than 30 pounds, that would provide an independent contribution towards the continuing degeneration of the back and what was exhibited on the April 1997 MRI?

[COUNSEL FOR TITUS]: Object as leading.

the Idaho physicians as he treated Claimant for three years following the initial injury; he was familiar with the nature of her work as a surgical technician both in Sioux Falls and in Idaho; he was familiar with her condition throughout his course of treatment and at the time she moved to Idaho; and he is the only physician to have treated Claimant who had the opportunity to compare the actual 1995 MRI film with the MRI film obtained in Idaho in 1997.

39. Dr. Hoversten is the most credible medical expert as he is the only physician who reviewed all of the medical evidence subsequently generated in connection with Claimant's treatment and the only physician to have compared the 1995 and 1997 MRI films.

40. The Department's Findings of Fact 35, providing that "Dr. Hoversten could only speculate as to what caused Claimant's condition to worsen from 1995 to 1997" is rejected as unsupported by the evidence and is specifically reversed.

41. The Department's Finding of Fact 37, providing that Dr. Hoversten "did not know specifically what Claimant did as a surgical technician in Idaho" is rejected as unsupported by the evidence and is specifically reversed.

A. Yes.

Q. [COUNSEL FOR SIOUX VAL-LEY] And is that the types of facts upon which you relied in coming up with that opinion?

A. Yes.

Thus, Dr. Hoversten's opinion was not dependent upon Titus' specific job duties in Idaho, only on the bending, twisting and lifting that were undeniably a part of the job.

[¶ 27.] The majority's assertion that Dr. Hoversten was "the only doctor to definitively state that continued employment independently contributed to [Titus'] injury" is controverted by the record. Affidavits in the settled record from Doctors Henbest and Ball specifically reflect agreement with Doctor Hoversten's opinion on independent contribution.

[¶ 28.] The majority concedes "none of the doctors could affirmatively state that the Claimant's continued employment did *not* contribute to her disability[.]" This is supported by the record. The depositions of Doctors Schneider, Zimmerman and McMartin all reflect equivocation on the issue of independent contribution. Dr. Schneider testified that "I don't think the work out here [in Idaho] contributed *any more* to it than her going to the grocery store and getting something." (emphasis added). Later he testified, "I think that just normal daily activities did contribute to this. And *some of the things she did at work might have contributed somewhat* to it just as some of the things at home would have contributed to it." (emphasis added). And further, "I think that just life in general contributed to it. *What she did at work may have played a little part,* but if she didn't have the job at the hospital, she may have ended up where she did today anyway." (emphasis added). And finally, "I just can't put my finger on any one particular thing that has caused this. And

I don't think the work she was doing here played *any more of a part* than just her normal day-to-day living." (emphasis added).

[¶ 29.] Dr. Zimmerman similarly testified that, "I would have to say because of the fact that she works, sure, it contributed to the natural progression. I mean, my response is somewhat contradictory when you look at it." Finally Dr. McMartin was simply inconclusive on the issue of independent contribution. He testified, "It's indeterminate whether her surgical technician work at West Valley [in Idaho] contributed to the progress of her symptomatology, likewise it's indeterminate in my mind as to whether or not it contributed to her need for surgery."

[¶ 30.] As I weigh the foregoing testimony, I find three doctors affirmatively representing that Titus' subsequent employment independently contributed to her disability, two doctors conceding that the employment could have contributed to the disability and one doctor declining to express an opinion one way or the other. De novo review in a case does not necessitate reversal. If findings are supported by substantial evidence, they are entitled to our consideration. In *Paulson,* 1996 SD 118 at ¶ 18, 554 N.W.2d at 197, we observed that the trial court's findings applying the last injurious exposure rule were "well reasoned, substantially supported by the evidence and . . . persuasive." Relying on those findings, we affirmed the court's determination that the Department of Labor erred in its application of the rule. *Id.* De novo review of the record here leads to a like conclusion. How can it be said on this record that Titus sustained her burden of proving by a preponderance of the evidence with conclusive medical evidence that her disability was the result of a recurrence rather than an aggravation of her initial injury? In my view, on this

record, the trial court reached an appropriate result based upon the standards and burdens of proof propounded by this Court and I would affirm its well reasoned decision.

[¶ 31.] ECKRICH, Circuit Judge, joins this dissent.