GROVER C. DILS MEDICAL CENTER, APPELLANT, v. DALE MENDITTO AND OLSTEN HEALTH SERVICES, RESPONDENTS.

No. 41732

June 9, 2005                                     112 P.3d 1093

*Moran & Associates* and *Jill M. Lynne,* Las Vegas, for Appellant.

*Craig P. Kenny & Associates* and *Kathryn N. Potvin,* Las Vegas, for Respondent Menditto.

*Santoro, Driggs, Walch, Kearney, Johnson & Thompson* and *Javier A. Arguello,* Las Vegas, for Respondent Olsten Health Services.

Before MAUPIN, DOUGLAS and PARRAGUIRRE, JJ.

## OPINION

*Per Curiam:*

In this appeal, we examine the "last injurious exposure" rule, which links workers' compensation liability with the employment that last contributed to the causation of a subsequent disabling condition. Primarily, the parties dispute whether the claimant's most recent disabling condition is, under the rule, the result of a work-related "aggravation" and thus the most recent employer's responsibility, or merely a "recurrence" of her previous injuries, which remains the former employer's responsibility. This opinion clarifies the standards for determining whether a subsequent condition is an "aggravation" or a "recurrence" under the rule: an "aggravation" is the result of a specific, intervening work-related trauma, amounting to an "injury" or "accident" under workers' compensation law, that independently contributes to the subsequent disabling condition; a "recurrence" occurs when no specific incident can independently explain the worsened condition.

### FACTS

In January 1997, while employed by respondent Olsten Health Services, respondent Dale Menditto was involved in a work-related

automobile accident; her subsequent workers' compensation claim was accepted, and she received treatment for her injuries. Thereafter, Menditto reported continued headaches and neck pain and intermittent numbness in her hands. A physician noted that Menditto's cervical spine discs protruded and were marked by mild spondylosis and spurring anteriorly at C4-5, C5-6 and C6-7. The physician related Menditto's symptoms to cervical radiculopathy. In the following months, Menditto complained multiple times of neck and low back pain, sensations of burning, and numbness. Menditto's doctors noted that her C5-6 disc protrusion could be causing some of her complaints. Even so, the doctors discovered no other objective findings, and despite Menditto's persisting symptoms, they recommended a full-duty work release. In June 1997, Olsten notified Menditto that her claim would be closed.

During the years following claim closure, Menditto occasionally sought medical assistance for similar symptoms. In 1998, Dr. Farhana Kamal diagnosed Menditto with chronic neck and back pain. In November 1998 and November 1999, Menditto obtained x-rays of her neck and back. The x-rays showed a decrease in the lumbosacral disc space because of mild degenerative changes or normal variant. In September and December 2000, respectively, Menditto reported to Dr. Kamal and another physician that she felt pain in the lower spine, "burning" hands and feet, and total numbness. She complained of feeling "pain all over" in late December 2000.

A March 15, 2001 medical report, from Dr. Kamal, indicates that Menditto had a two-year history of backaches and that she continued to feel pain in the low back that radiated to both legs, numbness in her arms and hands, and swelling. The report further notes that Menditto had experienced increasing pain since the 1997 accident.

Dr. Scott A. Parry also saw Menditto for neck and back pain in March 2001. Dr. Parry's report indicates that her troubles began with the 1997 accident; his impression was "cervical and lumbar radiculopathy status post whiplash type injury four years ago." On April 13, 2001, an MRI was obtained of Menditto's neck and back. Upon its review, Dr. Parry noted that Menditto had a bulging disc at C4-5 and C5-6 and "fairly moderate to severe degenerative disk disease at the lumbosacral junction." His diagnosis remained the same. Months later, in response to questions posed by Menditto's attorney, Dr. Parry stated that Menditto experienced "an exacerbation of her symptoms in February of 2001" and that "any pain she had in the cervical lumbar region in 2001 was likely a reaggravation of a pre-existing condition . . . . [N]early 100%[ ] would be attributable to the pre-existing condition that was a result of the 1997 industrial accident."

Meanwhile, Menditto changed employers; she began working for appellant Grover C. Dils Medical Center (Dils Medical) on November 10, 1999. On February 12, 2001, in the context of providing CPR to a patient, Menditto maintained a straddling position for an extended period. Later, on April 25, 2001, Menditto helped lift and maneuver an obese patient who had fallen out of bed. Shortly thereafter, in May 2001, Menditto's painful physical condition caused her to stop working. She subsequently signed a notice of injury form, asserting that her actions during the February CPR incident had hurt her back and neck, and that she had injured her back and spine during the April lifting incident.

Menditto continued to seek relief from various physicians. In May 2001, three doctors examined Menditto. Essentially, they all opined that Menditto's symptoms arose from her 1997 injuries and had since grown worse. The doctors noted that, according to Menditto, she had returned to her pre-accident baseline within several months after the accident, and she began reexperiencing back pain and other symptoms two to eight weeks earlier. One doctor, however, noted that he did not have available the 1997 medical records. Although another doctor suggested that Menditto's 1997 pain had subsided except for intermittent, nondebilitating pain, he also noted progressive neck difficulties since the 1997 accident, with radiating pain and constant headaches. The doctors found that Menditto had "recently" suffered a "recurrence" of her symptoms, which had been "aggravated" by her occupation as a nurse. Two of the doctors never specifically mentioned the February CPR or April lifting incidents; the other doctor stated only months later that Menditto had "sustained a re-aggravation of her neck and lower back pain in a work accident in February."

In June 2001, another doctor, Dr. Dale G. Stott, reported that after the 1997 accident, Menditto underwent therapy and was able to return to work, but that she "once again developed neck pain with a recurrence of symptoms including numbness . . . and burning" during the February CPR incident, and she sustained pain in the lower back during the April lifting incident. He stated that, although Menditto recovered from her 1997 injuries, she suffered recurrences of pain "in the process of working," due to her C4-5 cervical disc herniation/cervical radiculopathy and lumbar degenerative disc disease.

Dr. Kamal signed the June 2001 workers' compensation claim form for cervical disc herniation and degenerative lumbar disc disease, directly connecting the claims to Menditto's employment by checking the appropriate box and writing "aggravated at work." He also noted that Menditto's symptoms began with the 1997 accident and had been "aggravated by recent injury." But he also wrote on a physician's certificate that the date Menditto's condition com-

menced was "unknown." Dr. Kamal additionally penned a June 2001 letter in which he noted that Menditto was under his care for problems originating from the 1997 accident, that an (unidentified) MRI showed that her disc herniation had worsened, and that the aggravated condition required reopening of the 1997 claim.

Dils Medical's insurer denied Menditto's claim; consequently, Menditto requested Olsten to reopen the 1997 claim. Olsten also denied her request, and Menditto administratively appealed both Dils Medical's and Olsten's determinations. At the administrative hearing, the above evidence was submitted to the appeals officer. Menditto also testified as to the progressively worsening nature of her post-accident pain, which apparently increased, but did not change, with her work duties, but she was unable to recall anything that she had done that specifically caused the worsened pain. She also admitted that she had catered some of her statements to the doctors, overplaying the two incidents, and that at least one of the doctors' reports incorrectly indicated that her pain had subsided and did not interfere with her daily functions.

The appeals officer, however, found that Menditto's testimony at the hearing was not credible and instead purported to rely on "the recitation of facts contained within the early medical reporting." The appeals officer concluded that Menditto's condition had worsened since claim closure and had been "aggravated" by the February and April 2001 work-related incidents. Therefore, the appeals officer determined that Dils Medical is responsible for Menditto's claim under the last injurious exposure rule. The district court denied Dils Medical's subsequent petition for judicial review, and Dils Medical appeals.

## DISCUSSION

In the context of an appeal from a district court order denying a petition for judicial review of an administrative decision, this court examines the administrative decision for clear error or abuse of discretion.[1] While we independently review purely legal determinations, the appeals officer's fact-based conclusions of law are entitled to deference and will not be disturbed if they are supported by substantial evidence. Substantial evidence is "that 'which a reasonable person might accept as adequate to support a conclusion.'"[2] Nor will this court substitute its judgment for that of the appeals

---

[1]*Construction Indus. v. Chalue,* 119 Nev. 348, 352, 74 P.3d 595, 597 (2003) (citations omitted).

[2]*Ayala v. Caesars Palace,* 119 Nev. 232, 235, 71 P.3d 490, 491-92 (2003) (quoting *SIIS v. Montoya,* 109 Nev. 1029, 1032, 862 P.2d 1197, 1199 (1993)).

officer as to issues of credibility or the weight of the evidence.[3] Our review is limited to the record before the appeals officer.[4]

Here, the appeals officer's determination that Menditto's 1997 industrial condition had physically worsened, warranting additional compensation, is clearly supported by substantial evidence. Consequently, the main issue on appeal is whether the appeals officer properly held Menditto's subsequent employer, Dils Medical, instead of her previous employer, Olsten, responsible for Menditto's worsened condition under the last injurious exposure rule.

## The last injurious exposure rule

In successive injury/successive employer cases, the last injurious exposure rule places full liability upon the carrier covering the risk at the time of the most recent injury or aggravation of a prior injury that bears even a slight causal relation to the disability.[5] But "if the subsequent injury is merely a recurrence of the first, and does not contribute even slightly to the causation of the disabling condition, the [carrier] covering the risk at the time of the original injury remains liable for the subsequent injury."[6] Thus, determining which employer will be held liable for a subsequent injurious condition depends on whether the subsequent injury is characterized as a new injury, an aggravation of a prior industrial injury, or a recurrence of a prior industrial injury, as defined under the rule.[7] A new injury or an aggravation of the prior injury is the responsibility of the most recent employer. A mere recurrence remains the responsibility of the former employer.

The appeals officer's characterization of the injury, in light of the facts, medical evidence and circumstances, is a fact-based conclusion of law entitled to deference.[8] In this instance, no party contends, and no evidence demonstrates, that Menditto's most recent disabling condition is unrelated to her 1997 accident or was contributed to by a new and separate injury. Accordingly, the subsequent injury must be characterized under the last injurious exposure rule as either an "aggravation" or a "recurrence" of Menditto's previous injuries. Although a claimant's condition will

---

[3]*Chalue,* 119 Nev. at 352, 74 P.3d at 597.

[4]*Ayala,* 119 Nev. at 235, 71 P.3d at 491.

[5]*Las Vegas Hous. Auth. v. Root,* 116 Nev. 864, 869, 8 P.3d 143, 146 (2000).

[6]*Id.*

[7]*Id.*

[8]*See SIIS v. Swinney,* 103 Nev. 17, 20, 731 P.2d 359, 361 (1987).

have worsened in either instance, the two terms are not synonymous under the rule. Rather, characterizing the subsequent injury requires the fact-finder to also consider whether the subsequent injury in any way augmented the underlying cause of the disabling condition. And when, as here, a claimant's original symptoms persist at the time of a subsequent injury, determining whether the subsequent injury contributed to the disabling condition's causation is necessarily more difficult.

Other courts have grappled with this issue. The Delaware Supreme Court, in *Standard Distributing Co. v. Nally*,[9] rejected the proposition that "any work-related event or episode that results in disability constitutes an aggravation" under the last injurious exposure rule. The court recognized that the fact-finder "must focus equally on the causation factor since compensability for the new condition depends on its relationship to 'a new work-connected accident.' "[10] Therefore, it stated, "the question is not whether the employee's pain or other symptoms have returned but whether there has been a new injury or worsening of a previous injury attributable to an untoward event."[11]

And in *Rumford Press v. Travelers Insurance Co.*,[12] the New Hampshire Supreme Court upheld the characterization of a subsequent back injury as a recurrence under the last injurious exposure rule because the subsequent injury, incurred while lifting an object at work, was not a separate and independent cause of the claimant's disability. In that case, expert testimony demonstrated that the claimant's original disability had never reached a medically stable condition, but rather had continued to progressively degenerate, as experienced by the claimant in occasional "aggravations or 'flare-ups.' "[13] The court noted a difference between the aggravation of a stabilized condition and the recurrence, or "worsening or exacerbation," of an existing condition, and it concluded that an aggravation is established when the evidence demonstrates that "the second incident produced results that are not only tied to the disability but have intervened to the extent that they [are] an independent cause of the disability."[14]

---

[9]630 A.2d 640, 643 (Del. 1993).

[10]*Id.* at 645 (quoting *DiSabatino & Sons, Inc. v. Facciolo*, 306 A.2d 716, 719 (Del. 1973)). "The need to establish a second accident or event, beyond the normal duties of employment, is a continuing requirement in order to shift liability from the first carrier who bears responsibility for the effect of the original injury." *Id.* at 646.

[11]*Id.* at 645.

[12]480 A.2d 162 (N.H. 1984).

[13]*Id.* at 164.

[14]*Id.* at 165.

Similarly, in *Titus v. Sioux Valley Hospital*,[15] the South Dakota Supreme Court also likened a recurrence to the continuation or worsening of a previous industrial injury: "The question is not whether later employment contributed to [the] disability, but whether it contributed to the *causation* of [the] disability." Accordingly, the court concluded that an aggravation occurs when a second injury independently contributes to the cause of the final disability ("an independent aggravation"), but a recurrence is found when symptoms of the first injury persist and "there is no specific incident that can independently explain the second onset of symptoms."[16]

Although this court has not explicitly distinguished the terms "aggravation" and "recurrence" in this context,[17] we similarly deduced, when distinguishing between a newly developed injury and an aggravation in *Hayes v. SIIS*,[18] that an "aggravation . . . would be the result of a subsequent, intervening injury or cause that caused [the injury] to be put into a worse condition than it was put into by the [previous] accident." Like the *Titus* court, and consistent with our discussion in *Hayes*, we recognize that an "aggravation" under the last injurious exposure rule is the result of a specific, intervening work-related trauma, amounting to an "injury" or "accident" under workers' compensation law,[19] that independ-

---

[15]658 N.W.2d 388, 391 (S.D. 2003).

[16]*Id.*

[17]*See generally Root*, 116 Nev. at 869-70, 8 P.3d at 147 (determining that the evidence demonstrated an aggravation rather than a recurrence but not explicitly distinguishing between the two terms); *Collett Electric v. Dubovik*, 112 Nev. 193, 911 P.2d 1192 (1996) (same); *Swinney*, 103 Nev. at 20, 731 P.2d at 361 (same).

[18]114 Nev. 1340, 1343, 971 P.2d 1257, 1259 (1998); *see also* NRS 616C.160.

[19]*See* NRS 616A.030 (defining "accident" as "an unexpected or unforeseen event happening suddenly and violently, . . . producing at the time objective symptoms of an injury"); NRS 616A.265(1) (defining "injury" as "a sudden and tangible happening of a traumatic nature, producing an immediate or prompt result which is established by medical evidence"); *see also Swinney*, 103 Nev. at 20, 731 P.2d at 361. Additional support for the last injurious exposure rule's "injury" or "accident" prerequisite is found in NRS 616C.015(1), which requires an employee to provide the employer with written notice of any work-related injury "as soon as practicable, but within 7 days after the accident," and NRS 616C.025, which provides that, with certain exceptions, an injured employee is barred from receiving workers' compensation if NRS 616C.015 is not complied with. When a subsequent incident results in an injury or accident, the timing requirements (and any exceptions) appropriately apply as if the subsequent injury were a new claim. However, when an injury progressively worsens, it is difficult to immediately attribute that worsening to any specific incident, and the seven-day deadline is inapplicable. *See generally* NRS 616C.390 (governing claim reopening).

ently contributes to the subsequent disabling condition.[20] Thus, to be considered an aggravation, the subsequent injury must amount to more than "merely the result of the natural progression of the preexisting disease or condition,"[21] which becomes increasingly painful with the performance of normal work duties. Instead, when symptoms of an original injury persist and when no specific incident can independently explain the worsened condition, the condition is a recurrence of the original injury.[22]

Finally, determining which employer is liable in successive industrial injury cases requires that "aggravation" and "recurrence" be distinguished in the legal sense, not just the medical sense.[23] As the *Nally* court noted, "from a medical standpoint, opining physicians are more concerned with symptomatology than causation, and may[, as here,] use the term[s 'recurrence' and 'aggravation'] interchangeably in diagnosis."[24] Nevertheless, when determining whether a claimant with an ongoing condition suffered an "aggravation" under the last injurious exposure rule, the fact-finder should be concerned with whether the subsequent incident caused the original condition to worsen physically, not merely whether it merely caused additional pain to manifest itself.[25] And generally,

---

[20]*See also Root,* 116 Nev. at 869, 8 P.3d at 146 (likening the "aggravation" of a prior injury to a new injury); *Swinney,* 103 Nev. at 20-21, 731 P.2d at 361 (recognizing that an "aggravation" finding is supported by evidence that the claimant's previous condition improved after surgery, the claimant received no medical treatment for over a year prior to the second episode, and the second episode rose to the level of an injury or accident).

[21]*SIIS v. Kelly,* 99 Nev. 774, 776, 671 P.2d 29, 30 (1983), *superseded by statute,* NRS 616C.175.

[22]*See Burks, Inc. v. Blanchard,* 531 S.W.2d 465, 467 (Ark. 1976) (affirming a finding of "recurrence" when normal "working, stooping and bending" activities precipitated the anticipated return of back pain, even though "an injury did indeed occur"); *Crowe v. Jeld-Wen,* 712 P.2d 145, 149 (Or. Ct. App. 1985) (concluding that the claimant's subsequent employment had not contributed to her back disability, since she "merely experienced continuing symptoms and increased pain from her original injury when she engaged in continued activity").

[23]*Nally,* 630 A.2d at 645.

[24]*Id.*

[25]*United Methodist Senior Services v. Ice,* 749 So. 2d 1227, 1231, 1232 (Miss. Ct. App. 1999) (recognizing that determining whether an injury has been aggravated under the last injurious exposure rule calls for an actual worsening of the injury, not merely an analysis of the "ebb and flow of symptoms": "[p]ain is a symptom of an injury; that the pain worsens with certain activity does not mean the activity is increasing the injury but only that the activity is painful as a result of the injury"); *Matter of Compensation of Wills,* 650 P.2d 109, 109 (Or. Ct. App. 1982) (stating that the "resolution [of subsequent employer responsibility] depends on whether the second of two injuries . . . worsened the underlying condition or merely aggravated [the] symptoms").

"[b]ecause an injury is a subjective condition, an expert opinion is required to establish a causal connection between the incident or injury and disability."[26] "Evidence that an injury merely worsened is not sufficient to prove aggravation."[27]

Here, the appeals officer based her conclusion on our discussion in *Collett Electric v. Dubovik*.[28] In *Collett,* the claimant occasionally experienced hand-numbness symptoms while working for his previous employer; however, he was able to alternate tasks so that the problem did not significantly interfere with his work. The claimant then switched employers and, although the new work activities were similar to those at his previous employment, the conditions were substantially harsher and the work was more strenuous. Within a few weeks, the claimant's symptoms had increased to the point that he could no longer work, and he was diagnosed with cumulative trauma nerve entrapment syndrome.[29] Noting that the claim had been treated as an occupational disease case, we determined that the previous employer was improperly held responsible for the claimant's condition because, under the last injurious exposure rule in occupational disease cases, the most recent employer is held responsible if its workplace environment could have been a contributory cause of the disease. We then went on to note that treating *Collett* as an injury case would not have made a difference because the evidence demonstrated that the most recent employment's conditions actually did contribute significantly to the causation of the disabling condition. Therefore, the claimant's disability could not have been considered a recurrence.[30]

*Collett* does not stand for the proposition that any work-related incident that results in increased symptoms necessarily contributes to the causation of a disabling condition, and it is distinguishable from the present case. Unlike the *Collett* claimant, Menditto was not diagnosed with a cumulative trauma injury, where each addi-

---

[26]*Truck Ins. Exchange v. CNA,* 624 N.W.2d 705, 709 (S.D. 2001).

[27]*Id.* at 711; *see also Matter of Compensation of Perdue,* 631 P.2d 346, 348-49 (Or. Ct. App. 1981) (holding the previous employer liable when the claimant's previous symptoms persisted and no evidence demonstrated that he had sustained additional trauma, but only "a sudden aggravation of symptoms, worse than the first time, suggesting that his chronic back sprain ha[d] worsened and might now limit his ability to work to some extent"); *Town of Hudson v. Wynott,* 522 A.2d 974, 978 (N.H. 1986) ("Although there are situations in which a fact-finder may ignore uncontradicted medical testimony and rely on lay testimony and his own inferences, . . . [t]he causation of a back injury of this nature is a matter properly within the province of medical experts." (citation omitted)).

[28]112 Nev. 193, 911 P.2d 1192 (1996).

[29]*Id.* at 195, 911 P.2d at 1194.

[30]*Id.* at 198, 911 P.2d at 1196.

tional trauma caused by increasingly difficult work conditions would necessarily independently explain the condition's worsening. In *Collett,* once it was shown that the claimant's subsequent workplace environment caused additional trauma, that employment necessarily contributed to the causation of his underlying, cumulative condition.[31] Although Menditto's employment with Dils Medical could have physically exacerbated her condition, the worsening of her type of underlying injury was not necessarily caused by the Dils Medical employment; instead, the evidence indicates that Menditto's 1997 injury continued to worsen independently of her Dils Medical employment.

The appeals officer concluded that the factual details recited in the early medical reporting were the most reliable. The early medical reports, however, indicate that Menditto continued to suffer from symptoms of her cervical and lumbar injuries, suggesting that those injuries had not completely resolved. Even though no additional treatment was recommended in 1997, Menditto reported to doctors in 1998, 1999, and 2000 for similar symptoms. And although some doctors later indicated that Menditto felt that her pain had somewhat abated since the 1997 accident, many of those doctors' reports at the same time recognize the ongoing nature and progressive worsening of her 1997 condition. At the least, those medical reports establish that Menditto began to reexperience symptoms at some point before the February CPR incident at Dils Medical. Moreover, many of the later reports reflecting Menditto's abatement statements are inconsistent with the early medical reporting found more reliable by the appeals officer; some were even made before the doctors had reviewed the 1997 medical evidence. Although the reports might indicate that Menditto's symptoms increased with continued work, evidence that Menditto complained of similar symptoms before the February CPR incident should not be ignored. Although this court will not disturb determinations of credibility, since the record's evidence indicates that Menditto continued to suffer from symptoms relating to the 1997 injuries before

---

[31]*See Titus,* 658 N.W.2d at 390 (noting that, " '' when a disability develops gradually, or when it comes as a result of a succession of accidents, the insurance carrier covering the risk at the time of the most recent injury . . . is usually liable for the entire compensation' '' (quoting *St. Luke's Midland Regional v. Kennedy,* 653 N.W.2d 880, 885 (S.D. 2002))); *cf. Travelers Ins. Exchange,* 624 N.W.2d at 711 (holding, under test reiterated in *Titus,* the first of several employers liable for claimant's repetitive work activity disability because the disability was already in place at time claimant "left the risk" and there was no medical evidence demonstrating that the subsequent continued activity contributed even slightly to the *cause* of disability).

and during the February and April 2001 incidents, we note that any indication in the appeals officer's decision that Menditto's 1997 injuries had completely resolved appears inconsistent with the appeals officer's reliance on the early medical reporting.

Finally, we note that the appeals officer appears to have relied on several doctors' reports using the term "aggravation" in connection with Menditto's most recent symptoms. However, although some of Menditto's physicians used the term "aggravation" in connection with her work activities, others used the term "recurrence" and some used both terms; it appears in all cases that the doctors were referring to the appearance of symptoms, rather than to Menditto's actual physical condition. And many of the physicians merely noted that Menditto had indicated that the February and April incidents "aggravated" her prior back injury. Clearly, Menditto's use of the term "aggravation" to describe her symptoms does not conclusively establish medical causation. In addition, the April 13, 2001 MRI appears to be the most recent MRI available; therefore, any suggestion that Menditto's worsened condition, as evidenced in the MRI, can be attributed to the April 25 incident is suspect. As a result, it appears that the appeals officer based her conclusions on legally inconsistent medical evidence.

Accordingly, as we have now clarified the standards for determining whether a subsequent condition is an "aggravation" or a "recurrence" under the last injurious exposure rule, and because the appeals officer apparently relied upon evidence inconsistent with her conclusions, we conclude that this matter should be remanded for a new determination of whether the medical evidence establishes that the February CPR and/or April lifting incidents "aggravated" Menditto's back and neck condition, or whether Menditto suffered a mere "recurrence." In making the new determination, the appeals officer should consider whether the record contains any medical evidence demonstrating that the two incidents constituted "injuries" or "accidents" as defined by Nevada workers' compensation law or whether Menditto merely suffered progressively worsening symptoms. We reiterate that, in ongoing symptoms cases, the mere increased severity or exacerbation of symptoms, without more, is not "sudden" or "unforeseen" and does not constitute "objective symptoms of an injury" under Nevada's workers' compensation law.

And even if either of the two incidents constituted an injury or accident, the appeals officer should consider whether evidence in the record demonstrates that these incidents independently contributed to Menditto's final disabling condition. Thus, the appeals officer must determine whether any evidence sufficiently connects

Menditto's work at Dils Medical with anything more than Menditto's continued or increased symptoms. If the evidence demonstrates that the Dils Medical incidents amounted to injuries or accidents and independently contributed to Menditto's subsequent disabling condition, responsibility for Menditto's claim lies with Dils Medical; otherwise, if no specific incident can independently explain her worsened condition, Menditto's condition is a mere "recurrence," and Olsten must be held liable.

Finally, Dils Medical alternatively argues that Menditto's notification of injury was untimely. We note that, although the timeliness issue was raised during the hearing before the appeals officer, the appeals officer's original determination failed to address this issue. If, when rendering a new determination, the appeals officer determines that Menditto's subsequent condition is an aggravation, the appeals officer's new determination should also address Dils Medical's timeliness argument.[32]

## CONCLUSION

Under the last injurious exposure rule, an aggravation is established when medical evidence demonstrates that a specific subsequent work-related incident, amounting to an injury or accident, independently contributed to the final disabling condition. In this instance, the appeals officer's determination was based on inapplicable decisional law and inconsistent evidence. Accordingly, we reverse the district court's order denying Dils Medical's petition for judicial review, and we remand this matter to the district court with instructions to grant the petition and to direct the appeals officer to render a new determination regarding which employer is responsible for Menditto's claim under the last injurious exposure rule, in light of this opinion.

MAUPIN, J., concurring:

I concur in the majority analysis of the "last injurious exposure" rule. This latest articulation of the rule clarifies one aspect of a very complex statutory framework for compensating injured Nevada workers.[1] I write separately to note my concern over the evolution of that framework, and to urge that the Nevada Legislature commence a reexamination of it.

In *Las Vegas Housing Authority v. Root*,[2] we idealistically observed that "[t]he last injurious exposure rule . . . frees the employee from the burden of allocating responsibility for his disabil-

---

[32]*See supra* note 19.

[1]Here, NRS 616C.390.

[2]116 Nev. 864, 8 P.3d 143 (2000).

ity and forestalls any determination regarding which employment was the 'primary cause' of a work-related disease or injury."[3] If the case currently before us has any meaning at all, the last injurious exposure rule has done nothing of the kind. In short, this claimant's "burden" has been considerable.

The complicated analytical exercise performed by the majority in this matter typifies our recent attempts at interpreting the Nevada Industrial Insurance Act.[4] Such descriptives as "last injurious exposure" and "primary causation" are themselves demonstrative of the many obscure concepts that permeate this legislation. In short, the current statutory scheme has so evolved that workers' compensation claims have become "dances upon the heads of pins," choreographed in hyper-technical jargon. The resulting systemic difficulties affect virtually all of the participants in the claims process: employers, insurers, claims administrators, expert witnesses, administrative law judges, and most importantly, injured workers.

Many of the current legislative formulations for compensating injured workers came about in response to a fiscal crisis that developed in the late 1980s and early 1990s. To address the crisis in part, the 1993 Legislature enacted NRS 616A.010(2), which abrogated the previous common-law rule requiring broad or "liberal" construction of the Nevada Industrial Insurance Act in favor of injured or disabled employees. This provision was calculated to "neutralize" the rules of interpretation of the Nevada Industrial Insurance Act, has governed our decision making process up to the present, and was implicitly applied in the instant case. Unfortunately, as the complex analytics of the majority in this matter demonstrate, the neutrality rule provides precious little guidance to administrative law judges charged with deciphering confusing fact patterns and medical issues. Certainly, on remand, the administrative tribunal will find that the neutrality doctrine will, in opposition to its common-law predecessor, muddle rather than facilitate the ultimate resolution of this particular claim. In my view, this rule of interpretation, in its relation to an already complex statutory scheme, has created an atmosphere in which our workers' compensation claims process often becomes more about principle than about the people involved.

I want to stress that the problems exemplified by this case are not the fault of any functionary or participant in the workers' compen-

---

[3]*Id.* at 869, 8 P.3d at 146.

[4]*See, e.g., Ayala v. Caesars Palace,* 119 Nev. 232, 71 P.3d 490 (2003); *Construction Indus. v. Chalue,* 119 Nev. 348, 74 P.3d 595 (2003); *McClanahan v. Raley's, Inc.,* 117 Nev. 921, 34 P.3d 573 (2001); *SIIS v. Engel,* 114 Nev. 1372, 971 P.2d 793 (1998); *Rosser v. SIIS,* 113 Nev. 1125, 946 P.2d 185 (1997); *SIIS v. Bokelman,* 113 Nev. 1116, 946 P.2d 179 (1997).

sation claims process. These problems are likewise not the fault of the authors and proponents of the 1993 legislative amendments, who were tasked with salvaging a financially-strapped system for compensating injured workers. To me, it is time to look again at ways to upgrade the fairness of this very important program.

Because our role is limited to interpreting the Nevada Industrial Insurance Act, we must await intervention by the Legislature to address these issues. I take this opportunity to express my hope that the Legislature will commence a process of reevaluation of the Nevada workers' compensation system at the earliest possible time.